Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★      ★ ★ ★

# OPINION

No. 04-04-00784-CR

Mark **RAMOS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2004-CR-0984-C
Honorable Sharon MacRae, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:        Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:    September 10, 2008

AFFIRMED

Mark Ramos appeals his conviction for murder. We affirm the judgment.

## PROCEDURAL HISTORY

Ramos was found guilty by a jury of murdering Tracy Ortiz and was sentenced to ninety-nine years in prison. On appeal, Ramos argued the trial judge erred in failing to suppress his confession because the police did not scrupulously honor his invocation of the right to remain silent. In an unpublished opinion, with one justice concurring, this court affirmed the judgment, holding Ramos's invocation of his rights was not "unambiguous." *Ramos v. State*, No. 04-04-00784-CR, 2006 WL

1232896 at *2 (Tex. App.–San Antonio, May 10, 2006) (mem. op., not designated for publication), *reversed*, 245 S.W.3d 410 (Tex. Crim. App. 2008). The concurring justice concluded Ramos's assertion of his right was unambiguous, but would have held the error was harmless. *Id.* at *3 (Marion, J., concurring). On discretionary review, the court of criminal appeals held Ramos unambiguously invoked his right to remain silent and the police failed to scrupulously honor the assertion of that right. *Ramos*, 245 S.W.3d at 419. The court reversed this court's judgment and remanded the case to this court to determine whether the erroneous admission of Ramos's confession was harmless under the constitutional harmless error rule. *Id.*

### THE EVIDENCE AT TRIAL

### *Guilt/Innocence Phase*

On the evening of November 15, 2003, Ramos and his girlfriend, Camelle Gallegos, visited friends at Jonathan Rodriguez's house. Ramos, fellow gang members Rodriguez and Gerardo Guerrero, and their girlfriends, stood outside the house talking when a car drove by several times. The third time the car passed, someone in the car shot at the group. Nobody was injured, but the incident upset Ramos, who said he wanted to "go get" the shooters. Ramos and Gallegos attempted to follow the car but returned to the house about five minutes later. Ramos said he had lost sight of the car near "where Pluck lives." "Pluck or "Plucky" was a rival gang member who lived on Delgado Street. Ramos told the group he wanted to go "shoot up" Plucky and "he knew where they were at." According to Rodriguez and his girlfriend Roxanne Garcia, Ramos left with Guerrero and Gallegos in Gallegos's car, taking either an SKS or AK model rifle with them. Gallegos was driving, Guerrero was in the back seat, and Ramos was in the front passenger seat. When they returned to

Rodriguez's house about twenty minutes later, Ramos said "he had shot at Plucky" and had "blasted" "the people" who "went to shoot us up."

Ramos then suggested to the others that they go to a party at Larry Rubio's house a few blocks away. Ramos told Rodriguez and Garcia on the way to the party that "he got them good" and "he shot them up good." At the party, Ramos continued to brag about his shooting within earshot of other partygoers. Larry Rubio and his brother Michael testified that before Ramos arrived at the party they heard shooting coming from the direction of Delgado Street, which was about three blocks away. Later, Larry overheard Ramos tell Michael, in the presence of other people, "he had shot those mother f***ers." Michael testified Ramos told him that he "just did a drive-by off Delgado" because someone had "lit up" his friend's house. Michael also heard Ramos talking about the shooting in the kitchen in front of a group of people. Both brothers agreed Ramos appeared drunk, but Larry testified Ramos seemed more angry than drunk and Michael testified Ramos appeared "enraged" about the drive-by at Rodriguez's house. Apparently fearing a retaliatory shooting, the Rubio brothers told Ramos to leave the party.

Two witnesses who saw the shooting on Delgado Street testified at trial. Jose and Alex Anzures were standing outside their uncle's house on Delgado Street near the Ortiz residence when the shooting occurred. Jose testified he saw a car slow down, heard about ten shots, and saw shots fired from the passenger side of the vehicle. He could not tell how many people were in the car and was not sure whether the person shooting was male or female. Alex testified he first heard shots being fired. Then he turned around to see what was happening and saw shots being fired out of the passenger side of the car. Alex testified he saw a woman driving the car; a male sitting in the front

passenger seat with his window rolled up; and a male holding a handgun out of the back seat passenger window.

A little after 1:00 a.m., the San Antonio police received a report of a shooting at a house at 949 Delgado Street. This address is next door to the house where Joseph "Plucky" Garcia lived. Officers found a car with numerous bullet holes parked in front of 949 Delgado. A few feet inside the front door of the house they found Tracy Ortiz dead of a gunshot wound. Police recovered six shell casings and seven bullet fragments from the scene. During a search of Guerrero's house four days later, police recovered an SKS rifle, seventy-three rounds of live ammunition, and an ammunition drum for the rifle.

The State's ballistic expert testified the SKS is a semi-automatic assault rifle that fires a 7.62 caliber cartridge. He testified the shell casings found at the scene were of the caliber that would be used in an SKS, but he could not forensically link the casings to the weapon because there were insufficient tool marks on the casings. Only four of the bullet fragments could be identified as 7.62 caliber fragments. The remaining three did not have sufficient characteristics for identification. Police processed Gallegos's car for gunshot residue several weeks later. An expert testified evidence a weapon had been fired was found on the interior of the driver's door and the front passenger door. No samples were collected from the rear passenger compartment of the vehicle.

The police learned of Ramos's possible involvement and interviewed him at police headquarters. Ramos gave Detective Tim Angell a statement, which was introduced into evidence and which Detective Angell read to the jury. In the statement, Ramos initially denied involvement in the shooting. However, he agreed to confess after the detective told Ramos that Gallegos had admitted she was present when Ramos did the shooting. Ramos claimed Gallegos had no role in the

shooting and did not know he intended to shoot. Ramos described the earlier drive-by shooting at Rodriguez's house and claimed to be at the house when the police responded to calls about the shooting. He stated he had been drinking beer and "taking shots" and was "wasted." Ramos said did not know whose idea it was to "go shoot them up," but admitted he ended up in a car headed to Delgado Street.

Ramos stated he was sitting in the front passenger seat when someone handed him an AK-47 and told him to shoot the car. He claimed not to remember pulling the trigger, but thought he shot about fifteen or twenty times. Ramos also claimed he was trying to hit a car parked in front of the house and did not know he had hit the house. He did not know what happened to the gun. Ramos remembered going to a party after the shooting and "talking about how I lit up the car." The next day he learned from the news coverage that a woman had been shot and died.

After Detective Angell read the page-and-one-half long statement to the jury, he testified Ramos showed no emotion while confessing, he did not believe portions of the statement, and the weapon mentioned by Ramos in the confession was similar to the SKS seized from Gallegos's house.

### *Punishment Phase*

In the punishment phase of the trial, the State presented evidence of Ramos's juvenile and criminal record, beginning with juvenile adjudications for theft and evading arrest in 1997. Ramos was initially placed on juvenile probation, but was sent to a transitional living facility a month later after receiving further referrals for criminal trespass and theft of a vehicle. Ramos was released from that facility in November 1997 and continued on juvenile probation. However, in July 1998, Ramos

was adjudicated for burglary and committed to the Texas Youth Commission, where he remained for eleven months. He was released to parole in June 1999.

In January 2000, Ramos was arrested and charged as an adult for unlawfully carrying and discharging a weapon. He was placed on probation, but within a month the State filed a motion to revoke probation, alleging Ramos had illegally used a controlled substance. Ramos's probation was revoked and he was sentenced to ninety days in jail.

In May 2003, Ramos, Rodriguez, and Rodriguez's younger brother were involved in an altercation at a neighborhood convenience store. During the altercation, Ramos shot Hector Cardenas in the chest with a twelve gauge shotgun. Cardenas testified he was not involved in the altercation and had his hands up, telling Ramos he had nothing to do with it. His injuries required thirty-seven days of hospitalization.

The State presented evidence of Ramos's admitted membership in Characters Incorporated. A gang expert testified Characters Incorporated is a criminal street gang involved in "turf protection," "retaliation drive-bys," and some amount of narcotics trafficking. Finally, Frank Ortiz testified about the effect the death of his wife had upon his family. The State never referred to the confession during the punishment phase of the trial. The State requested the jury to impose a life sentence, and the defense made no punishment recommendation. The jury assessed a sentence of ninety-nine years.

### STANDARD OF REVIEW

In remanding this case, the court of criminal appeals directed this court to Texas Rule of Appellate Procedure 44.2(a) and cited *Clay v. State*, 240 S.W.3d 895 (Tex. Crim. App. 2007). Rule 44.2(a) provides:

> *Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

TEX. R. APP. P. 44.2(a). In *Clay*, the court of criminal appeals listed several factors to be considered in determining whether constitutional error in the admission of evidence is harmless: the importance of the evidence to the State's case; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; and any other factor, as revealed by the record, that may shed light on the probable impact of the error on the minds of the average juror. *Clay*, 240 S.W.3d at 904. Other cases indicate we may consider additional factors such as the source and nature of the error, the emphasis placed upon the evidence by the State, how much weight a juror might have placed on the evidence, and whether finding the error harmless would encourage the State to repeat the conduct. *See Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1990). A constitutional error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay*, 240 S.W.3d at 904.

## DISCUSSION

### *Importance of the Evidence to the State's Case*

In some cases a defendant's own confession is "the most probative and damaging evidence that can be admitted against him." *McCarthy*, 65 S.W.3d 47, 57 (Tex. Crim. App. 2001), *cert. denied*, 536 U.S. 972 (2002) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)). However, Ramos's confession did not play such a significant role in this case. The jury heard from four witnesses who testified Ramos made statements effectively admitting he was the person who

committed the shooting on Delgado street. Garcia and Rodriguez testified Ramos was angry and said he wanted to go shoot the person he thought committed the drive-by at Rodriguez's house. These witnesses and the Rubios all testified that after the shooting Ramos said he "shot them up good," "just did a drive-by off Delgado," and "had shot those mother f***ers." The evidence also established that Ramos's target was "Pluck," who lived next door to the Ortizes on Delgado. While the witnesses did not provide direct evidence that Ramos shot into the Ortiz house, neither did the confession. The only possible reference in the confession to shooting at the Ortiz house occurred when Ramos referred to the news coverage and stated, "I saw that a woman had been shot and she was dead."

The State did not rely heavily on the confession to secure a conviction, nor did the State emphasize the confession. During opening statement to the jury, the State referred to the confession once:

> When he talks to the police, he tells them, first of all, of course, I don't know anything about anything. I don't know anything. All right? But then when he realizes that his girlfriend, Camelle, has given him up, that his girlfriend, Camelle, has given a statement, and he realizes he has to come up with something, then he does admit. He admits that he was trying to get Plucky. That it was because of this earlier shooting that he went over there. He admits that he shoots the house. He admits that he's the one who fired the shots, he says 15 to 20 shots in his statement, all from that high powered rifle. All right. He admits that he shot the wrong house and that he's figured out now that it's the wrong house.

> And what you will see from this defendant's statement is that while he's telling you these things, he's giving you part of the truth. You will also see that there's several other things that are not true. But we'll go through that. We'll have time to look at it and you will actually get the statement back in the back to deliberate.

The State's closing argument demonstrates the relatively unimportant role the confession played in the State's case. Rather than portraying the confession as the linchpin to conviction, the

prosecutor argued the jury should rely on the testimony of the other witnesses. At the beginning of his closing argument, the prosecutor responded to defense counsel's argument that no eyewitness testified Ramos fired the weapon and that either Gallegos or Guerrero, who were charged as co-defendants, may have fired the murder weapon:

> Yes, Gerard Guerrero and Camelle Gallegos are charged with the same murder. Because in Texas, if you aide [sic] or assist somebody in committing a crime, then you are equally as guilty. It's called parties. You can do that. You get charged as well. But you'll notice from all the statements we've heard from all these people, from the friends of Mark Ramos at the parties before and after, did you hear a single person ever say Gerardo Guerrero did this? Not a single person. The only evidence out there, and in the defendant's statement, is that this is the man who did it. Okay?

After receiving a "five-minute warning" from the judge, the prosecutor returned to the issue of the confession. He referred to several parts of the confession and argued the jury should not believe most of Ramos's statement because Ramos was trying to minimize his culpability. He pointed out several parts of the confession that were untruthful, including Ramos's statement that he did not know "whose idea it was to go shoot them up" and that he was present when the police arrived at Rodriguez's house. The prosecutor suggested the jury compare the confession to the testimony of the witnesses and suggested the witnesses were more credible and told the real story of the crime.

*Was the Confession Cumulative of Other Evidence*

Most of the relevant facts in the confession were already before the jury when the confession was introduced into evidence. The only "new" evidence were Ramos's statements that someone handed him an AK-47 and told him to shoot the car and that he was trying to hit the car. However, Rodriguez and Garcia had previously testified Ramos took either an SKS or AK model weapon with him, and Ramos's statements to other people established he fired the weapon.

*The Presence or Absence of Other Corroborating or Contradicting Evidence*

There was a plethora of corroborating evidence. The contradicting evidence came primarily from Alex Anzures, who testified the front passenger window of the car was closed and the firing came from a handgun out of the rear passenger window. Yet this testimony was contradicted by ballistics evidence that the spent shells recovered from the scene were not fired from a handgun and at least three bullet fragments recovered from inside the victim's home were from a 7.62 caliber bullet, which is fired from a rifle.

*The Overall Strength of the State's Case*

The State's evidence against Ramos was strong. Four witnesses testified Ramos admitted to the shooting and their credibility was not seriously challenged. Rodriguez and Ramos were friends and fellow gang members. Rodriguez testified he was in prison on an unrelated charge at the time of trial, but received no benefit from the State for his testimony. Garcia and the Rubio brothers were not shown to have any motive to testify falsely against Ramos. The testimony from these witnesses damaged Ramos more than any words contained in his confession.

*Other Factors*

We do not identify any other factor in the record that sheds light on the probable affect the error had upon the jury's verdict. However, Ramos, citing to *Harris,* argues we are required to consider whether finding the error harmless would encourage the State to repeat the conduct. *See Harris*, 790 S.W.2d at 587. While the court of criminal appeals stated in *Harris* and in several other opinions that this was a factor to be considered, the court has not included this factor in its analysis in more recent opinions. *Compare Rubio v. State*, 241 S.W.3d 1, 9-11 (Tex. Crim. App. 2007) (*Crawford* error), *Clay*, 240 S.W.3d at 904-05 (*Crawford* error), *Scott v. State,* 227 S.W.3d

670, 690-95 (Tex. Crim. App. 2007) (*Crawford* error), *Davis v. State*, 203 S.W.3d 845, 850-53 (Tex. Crim. App. 2006) (*Crawford* error), *cert. denied*, 127 S.Ct. 2037 (2007), *Jones v. State*, 119 S.W.3d 766, 777-82 (Tex. Crim. App. 2003) (erroneous admission of confession), *cert. denied*, 542 U.S. 905 (2004), *and McCarthy v. State*, 65 S.W.3d at 52-56 (erroneous admission of confession), *with Lagrone v. State*, 942 S.W.2d 602, 620 (Tex. Crim. App.) (improper jury argument), *cert. denied*, 522 U.S. 917 (1997), *Higginbotham v. State*[1], 807 S.W.2d 732, 735-38 (Tex. Crim. App. 1991) (erroneous admission of confession), *and Harris*, 790 S.W.2d at 587 (erroneous admission of extraneous acts). However, we conclude that even if we consider this factor in our analysis, the result would be the same. The importance of the evidence was minor, the strength of the State's case was great, and the prosecutor did not emphasize the confession as the linchpin to conviction but rather as evidence to suggest the jury should rely on the testimony of the witnesses. While we are concerned when the police do not scrupulously honor a suspect's invocation of his rights, including his right to remain silent or terminate an interview, we remain convinced beyond a reasonable doubt the confession did not contribute to the jury's verdict of guilt.

In his brief on remand, Ramos does not argue the confession contributed to his punishment. Our review of the evidence in light of the appropriate factors compels the conclusion, beyond a reasonable doubt, that it did not. The jury heard evidence Ramos engaged in criminal acts escalating in severity, including an attempted murder just six months before he murdered Ortiz. It also heard evidence about his gang membership, his inability to control his behavior, and his reproachful

---

[1]We agree with Judge Clinton's concurrence in *Higginbotham* where he questions the use of the "repetition of the error with impunity" factor in a harmless error analysis. *Higginbotham*, 807 S.W.2d at 739-40 (Clinton, J., concurring).

behavior the night of the murder.  The State did not mention the confession during the punishment phase of the trial.

## CONCLUSION

Reviewing the evidence in light of the appropriate factors, we conclude beyond a reasonable doubt the erroneous admission of the confession did not contribute to Ramos's conviction or punishment and hold the error was harmless.  The judgment of the trial court is affirmed.


Steven C. Hilbig, Justice

Publish