Affirmed and Memorandum Opinion filed July 21, 2009








Affirmed and Memorandum Opinion filed July 21, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00062-CR

____________

 

KEITH CHESTER HILL, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 337th
District Court

Harris County, Texas

Trial Court Cause No. 1103320

 



 

M E M O R A N D U M   O P I N I O N

A jury convicted appellant Keith Chester Hill of aggravated
sexual assault and assessed punishment at ninety-nine years= imprisonment and
a $10,000 fine.  In two issues, appellant requests a new punishment hearing,
contending that (1) the trial court erred in admitting his written confession
because it was taken in violation of his right to counsel and (2) the
prosecutor made an improper closing argument at punishment.  We affirm.








Baytown Detective J.R. Miller questioned[1] appellant, who
was nineteen years old at the time, following his arrest for the aggravated
sexual assault of the complainant, an adult male.  After appellant was read his
rights and acknowledged understanding them, the following exchange occurred:

[Det. Miller]: Okay. 
This bottom part is just a waiver of your rights and it says AI have read this statement of my
rights.  I understand what my rights are.  I=m willing to make a statement and answer questions.  I wish
to waive any of those rights and I understand and know what I am doing.@  Okay.  And what that is about is
I would like to visit with you for awhile and ask you some questions, doesn=t mean that you can=t terminate the interview still,
but just means that for the time being you=re willing to visit with me.  Okay?

[Appellant]: I was told
not to answer any questions.

[Det. Miller]: Who told
you that?

[Appellant]: I ain=t gonna say who told me that, but I
was told just AGet a lawyer.@

[Det. Miller]: Do what?

[Appellant]: AGet a lawyer.@

[Det. Miller]: Okay. 
Well that is entirely up to you.  You=re a grown man in the eyes of the State of Texas.  I=d like to visit with you obviously
about what=s going on and . . . get your
feelings and thoughts about where we=re at with this and et cetera.  But you=re a grown man, so we can start for
a while and you can choose to discontinue at any time.

[Appellant]: Can I get
one?

[Det. Miller]: Do what?

[Appellant]: Can I get
one?

[Det. Miller]: Can you
get one?

[Appellant]: A lawyer.








[Det. Miller]:
Certainly.  That=s absolutely you=re right.  I can=t prevent you from doing that.  Are
you saying that you would not like to visit with me about what=s going on and . . .

[Appellant]: Oh, well.

[Det. Miller]: et cetera

[Appellant]: I was told
not to say nothing so, you know.

[Det. Miller]: Somebody
told you not to say nothingCsay anything?

[Appellant]: Mmm-hmm.  AGet a lawyer [unintelligible].@

[Det. Miller]: Well,
again, you=re a grown man.  That=s a decision you need to make for
yourself, not somebody else make it for you.

[Appellant]: Okay.  I=ll get one.

[Det. Miller]:  You=ll do what?

[Appellant]: I=ll get one.

[Det. Miller]: Get one?

[Appellant]: A lawyer.

 

Detective Miller continued questioning appellant. 
Appellant responded to Detective Miller=s continued
questioning and eventually waived his rights, but denied the allegations after
several hours of questioning.  Later that day, appellant was taken before a
magistrate who warned appellant of his rights and noted that appellant
requested the appointment of counsel at that time.

Authorities transferred appellant from Baytown to the
downtown Harris County Jail, where he was taken to inmate processing.  On
February 8th, Detective Shane McCoy had appellant removed from inmate
processing and placed in an office.  Detective McCoy re-administered appellant=s rights. 
Appellant waived his rights and eventually gave a detailed written confession
to the aggravated sexual assault of four men (Q.C., Cr.B., J.O., and the complainant),
and the attempted aggravated sexual assault of a fifth man (Ca.B.).








At the suppression hearing, Detective McCoy admitted
initiating contact with appellant and stated that to his knowledge appellant
had never requested to speak to law enforcement officers.  The trial court
viewed the recording of Detective Miller=s questioning,
heard the testimony of Detective Miller and Detective McCoy, and denied
appellant=s motion to suppress, finding that appellant never
unambiguously invoked his right to counsel.

At the guilt/innocence phase of trial, a redacted
confession was admitted, which related appellant=s assault on the
complainant.  Also, the complainant described the assault before the jury.  He
testified that one evening a dark-skinned male abducted him at gunpoint from
his driveway, asked where he kept his wallet, put him face down on the ground,
bound his hands with zip ties, placed duct-tape over his eyes, put him in an
SUV, and began driving.  The assailant eventually stopped, told the complainant
he would make him pay for not having any money, and sexually assaulted him at
gunpoint.  The complainant testified that his shirt was probably stained with
the assailant=s semen during this incident, and the State presented
evidence that semen stains on the complainant=s shirt matched
appellant=s DNA profile.  After sexually assaulting the
complainant, the assailant beat him with the butt of his pistol, drove to
another location, released the complainant, and fled.  The jury convicted
appellant of the aggravated sexual assault of the complainant.








At the punishment phase, the redacted portions of appellant=s confession
regarding the incidents involving Q.C., Cr.B., J.O., and Ca.B. were read before
the jury.  Detective Miller testified that the incidents occurred over ten
months and that all of the victims gave similar suspect descriptions.  He
further testified that similar demands were made in each incident and that the
cases involving Q.C., the complainant, Cr.B., and J.O. were similar in several
respects, leading Detective Miller to believe they were committed by the same
person.  Detective McCoy testified that the modus operandi in the incidents
involving Q.C. and Ca.B. mirrored all of the other cases.  A class ring taken
during Q.C.=s assault and a newspaper clipping regarding the
offenses were found in appellant=s home.  Analysis
of appellant=s computer showed that all five victims= names and
addresses were on the hard drive; all of their addresses had been used in
internet searches, and several of their Myspace pages had been visited, even
though the police never released any of the victims= information.  The
jury also heard the testimony of Q.C., Cr.B., and J.O. describing their
respective assaults, and Detective McCoy testified regarding the assault on
Ca.B. and his subsequent identification of appellant as his assailant.

Q.C. testified that a masked man with a pistol approached
him at the end of Q.C.=s driveway, pushed him to the ground, tied
his hands with zip ties, and forced him into Q.C.=s truck.  The
assailant drove the truck to a field and duct-taped Q.C.=s eyes.  He then
took Q.C.=s wallet and removed money from Q.C.=s bank account
after demanding his PIN at gunpoint.  While driving, the assailant sexually
assaulted Q.C. and beat him with a pistol.  The assailant then stopped in a
field.  He pulled Q.C. out of the truck and threatened to shoot or kill him if
he tried to escape.  He then walked Q.C. (who was naked from the waist down at
that point) around the field, threw him down next to the truck, and sexually
assaulted him for ten to fifteen minutes.  He took naked pictures of Q.C. and
threatened to post them on Myspace if Q.C. said anything.  The assailant left
Q.C. sitting in thorn bushes in a drainage ditch and fled with Q.C.=s class ring,
among other items.  Authorities later found the ring at appellant=s residence.








Cr.B. testified that he answered the door one morning to
find a black male with his face covered threatening him with a gun.  The
assailant entered Cr.B.=s home, told him to lie face down, bound
him with zip ties, duct-taped his eyes and face, and took his money.  Cr.B.
freed one of his hands and attempted to escape, but his assailant put him in a Achoke hold,@ threw his head
against the door multiple times, and retied his hands.  The assailant then
attempted to sexually assault him.  When Cr.B. resisted, the assailant beat him
and placed duct tape over his mouth and nose, causing him to pass out.  The
assailant told him to wake up, kicked him in the head, poked him in the stomach
with a knife, and threatened to stab him.  The assailant left Cr.B. with a
knife to cut himself free and fled.  Cr.B. could not identify his assailant. 
Detective Miller testified that a composite sketch based on Cr.B.=s description of
the assailant was not Aparticularly close@ in appearance to
a previous sketch of the assailant from one of the other incidents and was not
released for fear that it would confuse the public.  Appellant was excluded as
a contributor to DNA evidence obtained by swabbing duct tape from Cr.B.=s assault, though
an unknown third person=s DNA was found.  However, analysis of
appellant=s computer showed that it had been used to visit Cr.B.=s Myspace page,
and that Cr.B.=s last name and home address had been used to conduct
whitepages and Map Quest searches on the internet.

J.O. testified that he returned to his bedroom from the
bathroom one night to find a black male with a gun in his room.  The assailant
put the gun to the back of J.O.=s head, told him to lie on the bed,
covered J.O.=s face, and asked him if he had any money.  He then
walked J.O. to the woods at knifepoint.  In the woods, the assailant told J.O.
to lie face down on the ground and attempted to sexually assault him.  When
J.O. resisted, the assailant picked him up and slammed his head into a tree
multiple times, knocking him down.  The assailant walked J.O. farther into the
woods and attempted to sexually assault him again, but fled when J.O. escaped. 
At a later date, J.O. saw appellant at a stoplight and thought he was his assailant. 
J.O. followed appellant=s car after appellant acted suspiciously,
covered up his face, and sped away when he saw J.O.  J.O. failed to identify
appellant as his assailant from a photo array, despite recognizing him as
someone from school.  However, on cross examination by the defense, J.O.
testified as follows:

[Defense Counsel]: . . .
[Y]ou say you had a glance [at your assailant] in the dark?

[J.O.]: Yes.

[Defense Counsel]:  That
person wasn=t Keith Hill?

[J.O.]:  Oh, I don=t know.  I=m thinking it was.

[Defense Counsel]:  But
you=re not sure?








[J.O.]: I=m not for sure, not a hundred
percent.  But if I had to say Ayes@ or Ano,@ I=d say Ayes.@

 

Though Ca.B. did not testify at punishment, Detective McCoy
(who handled Ca.B.=s case) testified that the modus operandi
in his case was similar to Q.C.=s case in many respects, including the
description of the assailant, and the use of a pistol and zip ties.  Detective
McCoy also testified that Ca.B. identified appellant as his assailant from a
photo lineup.  Further, the evidence showed that appellant=s computer was
used to access Ca.B.=s Myspace page and conduct a map search on
the internet using his address.

The jury sentenced appellant to ninety-nine years= imprisonment. 
This appeal followed.

In his first issue, appellant argues the trial court=s admission of his
written confession violated his right to counsel under the Fifth Amendment
because he invoked that right during his interrogation by Detective Miller. 
Appellant requests a new trial on punishment only and acknowledges that any
error in the admission of his redacted confession at guilt/innocence was
probably harmless given the complainant=s testimony and
the State=s DNA evidence.  We therefore limit our analysis to
whether the trial court erred by admitting appellant=s full confession
at punishment.








When reviewing a trial court=s ruling on a
motion to suppress, we afford almost total deference to determinations of
historical facts, especially when those determinations involve assessment of
witness credibility and demeanor.  Masterson v. State, 155 S.W.3d 167,
170 (Tex. Crim. App. 2005).  We accord the same deference to determinations of
mixed questions of law and fact if their resolution depends upon witness
credibility and demeanor.  State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim.
App. 2000).  However, when, as here, we have a videotape of the confession and
an uncontroverted version of events, we review the trial court=s ruling on an
application of law to facts de novo.  Herrera v. State, 194 S.W.3d 656,
658 (Tex. App.CHouston [14th Dist.] 2006, pet. ref=d); Mayes v.
State, 8 S.W.3d 354, 358 (Tex. App.CAmarillo 1999, no
pet.); see also Carmouche v. State, 10 S.W.3d 323, 332 (Tex. Crim. App.
2000) (stating that the court will not turn a blind eye to a videotape when it
presents indisputable evidence contradicting the testimony of a police officer
and noting that evaluating videotape evidence does not involve evaluations of
credibility and demeanor).

The police must advise a suspect whom they have arrested of
the right to have counsel present during any police-initiated interrogation.  Miranda
v. Arizona, 384 U.S. 436, 479 (1966).  Unlike the right to counsel under
the Sixth Amendment, which attaches automatically, the Fifth Amendment right to
counsel will attach only when affirmatively invoked by the accused.  See
Davis v. United States, 512 U.S. 452, 456B57, 459 (1994). 
However, such an invocation must be clear, unambiguous, and unequivocal. See
id. at 461B62; Dinkins v. State, 894 S.W.2d 330, 351B52 (Tex. Crim.
App. 1995).  Whether the mention of a lawyer constitutes a clear invocation of
the right to counsel will depend upon the statement itself and the totality of
the surrounding circumstances.  See Davis, 512 U.S. at 459.  The test is
an objective one: the suspect Amust articulate his desire to have counsel
present sufficiently clearly that a reasonable police officer in the
circumstances would understand the statement to be a request for an attorney.@  Id. at
458B59.








Once the suspect has invoked the Fifth Amendment right to
counsel, police interrogation must cease until counsel has been provided or the
suspect himself reinitiates further communication, exchanges, or conversations
with police.  Edwards v. Arizona, 451 U.S. 477, 484B85 (1981); State
v. Gobert, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009).  The impetus for
reinitiation must come from the suspect, not from police interrogation or
conduct that is the functional equivalent of interrogation.  See Moran v.
State, 213 S.W.3d 917, 922B23 (Tex. Crim. App. 2007); Martinez v.
State, 275 S.W.3d 29, 35 (Tex. App.CSan Antonio 2008,
pet. struck).  AOnce a suspect has clearly invoked his
right to counsel, no subsequent exchange with the police (unless initiated by
the suspect) can serve to undermine the clarity of the invocation.@  Gobert,
275 S.W.3d at 894 (discounting as immaterial to the analysis the court of appeals=s observation that
immediately after defendant clearly invoked right to counsel, he told the
police that he was willing to talk to them in response to their questions Ayou don=t want to talk?@ and Ayou don=t want to talk to
us?@).  Further, one
officer=s knowledge that a
defendant has requested counsel is imputed to every other State agent.  Herron
v. State, 86 S.W.3d 621, 628 (Tex. Crim. App. 2002); see also Arizona v.
Roberson, 486 U.S. 675, 687B88 (1988) (stating that a second
interrogating officer is under a duty to determine whether the suspect
previously invoked the right to counsel and is not justified in failing to
honor the request based on ignorance).








Here, after appellant acknowledged understanding his
rights, Detective Miller told him he would like to question him about the
allegations, to which appellant responded that he was told not to say anything
and to get a lawyer.  Detective Miller told appellant that appellant could make
that decision, but said that they could talk for awhile and stop when appellant
so chose.  Appellant responded, ACan I get [a
lawyer]?@  Detective Miller
told appellant that getting a lawyer was his right.  He then asked if appellant
was saying that he did not want to talk with him.  Appellant responded that he
was told not to say anything and to get a lawyer.  Detective Miller told appellant
that was a decision he needed to make for himself.  Appellant responded by
stating AOkay, I=ll get [a lawyer].@  Based on
appellant=s statements and the totality of the circumstances, we
believe that appellant articulated his desire to have counsel present
sufficiently clearly that a reasonable police officer in the circumstances
would understand the statement to be a request for an attorney.  See Davis,
512 U.S. at 458B59.  When appellant stated AOkay, I=ll get [a lawyer]@ after Detective
Miller put him to a decision on that issue, all questioning should have
immediately ceased until counsel was provided or appellant reinitiated the
conversation.  See Gobert, 275 S.W.3d at 892.  Instead, Detective Miller
asked if appellant was saying that he did not wish to talk.  Although appellant
eventually stated that he wanted to talk and waived his rights and confessed,
he did not reinitiate contact with police.  See Martinez, 275 S.W.3d at
35.  Where, as here, the authorities followed a suspect=s clear invocation
of the right to counsel by asking if the suspect does not wish to speak with
authorities, a defendant=s response that he does wish to talk may
not be used to cast retrospective doubt on the clarity of the initial request
itself.  See Gobert, 275 S.W.3d at 894.  The fact that appellant
confessed only after Detective McCoy reapproached him, reread his rights, and
secured a waiver of those rights is immaterial because Detective McCoy
reinitiated contact and was charged as a State agent with knowledge of
appellant=s prior invocation.  See Herron, 86 S.W.3d at
628; Roberson, 486 U.S. at 687B88.  We therefore
hold that the trial court erred in admitting appellant=s confession,
which was taken in violation of his Fifth Amendment right to counsel.








Having determined an error of constitutional magnitude
occurred, we must reverse the judgment unless we determine the error was
harmless as to punishment beyond a reasonable doubt.  See Tex. R. App. P. 44.2(a); McCarthy v.
State, 65 S.W.3d 47, 52 (Tex. Crim. App. 2001); Mayes, 8 S.W.3d at
361.  In determining whether constitutional error in the admission of evidence
is harmless, we consider several factors, including: the importance of the
evidence to the State=s case; whether the evidence was
cumulative of other evidence; the presence or absence of other evidence
corroborating or contradicting the evidence on material points; the overall
strength of the State=s case; the content of the erroneously
admitted statement; and any other factor, as revealed by the record, that may
shed light on the probable impact of the error on the mind of the average
juror.  See Clay v. State, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); see
also Jones v. State, 119 S.W.3d 766, 778 (Tex. Crim. App. 2003) (assessing
harm in erroneous admission at punishment of appellant=s inculpatory
statement regarding two extraneous offenses by assessing the probable weight a
juror would place on the statement given the independent proof of appellant=s involvement in
extraneous offenses; the content of the statement; and the error=s collateral
implications).  Other cases indicate we may consider additional factors such as
the source and nature of the error, the emphasis placed upon the evidence by
the State, the probable collateral implications of the error, the weight a
juror may have placed on the evidence, and whether finding the error harmless
would encourage the State to repeat the conduct.  See Higginbotham v. State,
807 S.W.2d 732, 735 (Tex. Crim. App. 1991); Harris v. State, 790 S.W.2d
568, 587 (Tex. Crim. App. 1989); see also Jones, 119 S.W.3d at
778.  AReversal is
required unless we can determine, beyond a reasonable doubt, that the failure
to suppress the [erroneously admitted] statement did not contribute to the jury=s verdict at the
sentencing phase.@  Jones, 119 S.W.3d at 777.  A
constitutional error does not contribute to the punishment if the jury=s verdict would
have been the same even if the erroneous evidence had not been admitted.  See
Clay, 240 S.W.3d at 904.  However, the fact that the State offered the full
confession only at punishment affects our analysis because at sentencing the
issue is not whether appellant did or did not commit the extraneous offenses,
but rather the appropriate punishment to be assessed.  See Jones, 119
S.W.3d at 777.








Although a defendant=s confession is
generally likely to have a profound impact on the jury, especially at the guilt
stage of the trial, the circumstances of a particular case may render the
erroneous admission of such evidence at sentencing harmless.  See id. at
780B83.  For instance,
an erroneously admitted confession may play an insignificant role in the State=s case where the
jury is presented with substantial other evidence linking a defendant to the
confessed offenses.  See Wall v. State, 184 S.W.3d 730, 746 (Tex.
Crim. App. 2006); Jones, 119 S.W.3d at 780B83; Ramos v.
State, 273 S.W.3d 356, 360 (Tex. App.CSan Antonio 2008,
pet. ref=d).  Here,
substantial other evidence was presented linking appellant to the extraneous
offenses.  At appellant=s home authorities found Q.C.=s class ring, linking
him to Q.C.=s assault, along with a newspaper clipping regarding
the offenses.  The State presented independent evidence of the remarkably
similar modus operandi, assailant descriptions, and details of each offense,
evidence which rendered the bulk of appellant=s confession
cumulative.  Although the confession contains details not reported by other
sources regarding appellant=s planning of and preparation for the
offenses, the jury could easily infer that the offenses were calculated and
predatory based on the State=s witnesses= offense descriptions
and the evidence found on appellant=s computer.  The
State also linked appellant to the offenses and demonstrated his predatory
nature through the testimony of an F.B.I. computer analyst regarding the
contents of appellant=s computer: all five victims= names and
addresses were found on the computer=s hard drive even
though, according to Detective Miller, that information was not released to the
public; four of the victims= addresses were used in searches on map
sites, while the other victim=s address was used for a search on ANew Home
Source.com@; at some point, a A.jpg@ picture file
identifying Q.C.=s genitalia was on the computer; and the
MySpace pages of Ca.B., Cr.B., and possibly J.O. had been visited from
appellant=s computer.  Finally, Ca.B. and J.O. identified
appellant as their assailant.  We note that Cr.B. and J.O. testified that their
assailant only attempted to sexually assault them, contradicting appellant=s confession to
actually sexually assaulting them.  However, we believe beyond a reasonable
doubt that this discrepancy had no effect on the jury=s punishment
assessment given the undisputed evidence illustrating the brutality and
violence of the attacks on Cr.B. and J.O.  Given the strength of the State=s case absent the
confession and the substantial other evidence linking appellant to the
extraneous offenses, the confession was largely cumulative and thus was
relatively unimportant to the State=s case.  See
Jones, 119 S.W.3d at 780.








Next, we examine the confession=s content and any
collateral implications stemming from the confession=s admission.  See
id. at 781.  In Jones v. State, the Court of Criminal Appeals held
harmless the erroneous admission at punishment of a defendant=s confession to
two extraneous offenses, noting that the confession was replete with self-serving,
mitigating statements and that there were no detrimental collateral
implications stemming from the taking or admission of the confession.  See
id. at 780B83.  Though appellant=s confession
contains his admission to committing the extraneous offenses, it also contains
several mitigating statements.  See id. at 781.  For instance, appellant
stated that a white male intruder molested him as a child.  He then stated that
he Arecently met a
girl@ who had a similar
experience, and claimed that her story led him to realize that he Aneeded to better
deal with@ his childhood molestation and Aneeded to stop
taking the >dignity= away from the
white males who [he] had been after.@  Appellant also
expressed Adeep regrets@ over the offenses
and stated his belief that the offenses occurred because of his mental issues,
for which he expressed a desire to be treated.  Finally, appellant stated that
he is Avery sorry@ for his actions
and asked for his victims= forgiveness.  We believe these mitigating
statements negated any harmful impact that the error might have otherwise had
on the jury=s punishment assessment.  See Higginbotham, 807
S.W.2d at 737 (holding that a probable affect on the harshness of the
punishment is a collateral implication of erroneously admitting a confession,
but implying that a jury is logically less likely to give a harsh punishment to
a defendant who shows remorse and disturbance after committing the crime).  The
lack of negative collateral implications stemming from the confession=s admission is
further demonstrated by the fact that appellant did not dispute his commission
of the extraneous offenses at the punishment phase (or on appeal), but rather
sought leniency from the jury and argued that the offenses were out of
character.  See Jones, 119 S.W.3d at 782 (finding no detrimental
collateral implications stemming from erroneously admitted statement where
defendant did not dispute his involvement and his mitigation case was
apparently unaffected).








The State placed little emphasis on the erroneously
admitted confession.  The State mentioned appellant=s confession at
the beginning of its final closing argument, but did so in the context of
explaining to the jury when they could consider extraneous offenses at
punishment.  In giving that explanation, the State also pointed to (1) other
evidence implicating appellant and (2) the closing argument of defense counsel
to assert, without objection, that appellant was not contesting his commission
of the extraneous offenses.  At one point in closing arguments, the State even
made an apparent attempt to discredit portions of the confession by implying
that differences between it and some of the victims= accounts resulted
from fabrications by appellant.  Although the State argued: A[Appellant] has
the gall to mention God in his confession.  There=s only one God in
[appellant=s] world, and that=s [appellant].  Control,
power, that=s what it=s about,@ this reference to
the confession was very brief and was apparently meant to impugn appellant=s character,
rather than being an attempt to emphasize the confession itself.  See Jones,
119 S.W.3d at 782 (considering State=s reference to
defendant=s statement as a rhetorical flourish in finding
statement=s erroneous admission harmless).  Finally, we see no
potential harm in the State=s argument that appellant should not get
credit for confessing when the physical evidence against him was limited by his
victims= resistance, as
that reference to appellant=s confession was made in response to the
defense=s closing
argument.  See id. at 782 (considering fact that State=s reference to
defendant=s statement was made in response to the defense=s closing argument
in holding statement=s erroneous admission harmless).

While holding the erroneous admission of appellant=s confession
harmless could encourage the State to repeat the conduct,[2]
that factor does not effect our decision here given our analysis of the other
factors above.  See Ramos, 273 S.W.3d at 362.  We are concerned when, as
here, the police disregard a suspect=s invocation of
the right to counsel, and we emphasize that the erroneous admission of a
resulting confession will result in the reversal of a conviction unless it is
proven harmless beyond a reasonable doubt.  However, having reviewed the
evidence in light of the appropriate factors, we are convinced beyond a
reasonable doubt that under the circumstances of this particular case the jury=s punishment
assessment would have been the same even if appellant=s confession had
not been admitted.  See Clay, 240 S.W.3d at 904; Jones, 119
S.W.3d at 783.  We therefore hold the erroneous admission of appellant=s confession
harmless, and overrule his first issue.








In his second issue, appellant contends that the prosecutor
made an improper personal attack on appellant in his closing argument at
punishment by contending that appellant is Anot human.@  However,
appellant waived this issue by not objecting in the trial court.  See
Threadgill v. State, 146 S.W.3d 654, 670B71 (Tex. Crim.
App. 2004) (holding that appellant waived complaint regarding allegedly
improper jury argument by failing to object to it in the trial court, even if
such argument could not have been cured by an instruction); Cockrell v.
State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (failure to object to a
jury argument waives right to complain about that argument on appeal). 
Appellant cites no authority to support his argument that we should excuse that
omission.  See Tex. R. App. P. 38.1(i). 
We therefore follow the binding contrary authority cited above and overrule
appellant=s second issue.

Having overruled both
of appellant=s issues, we affirm the trial court=s judgment.

 

 

/s/      Leslie B. Yates

Justice

 

 

Panel consists of
Justices Yates, Guzman, and Sullivan.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  A DVD recording of Detective Miller=s questioning was entered into evidence and viewed by the
trial court at the suppression hearing.





[2]  We note some skepticism in the caselaw over whether
we should continue to apply this factor, given that the Court of Criminal
Appeals has omitted it from its analysis in more recent opinions.  See Ramos,
273 S.W.3d at 361B62 & n.1.