



## MEMORANDUM OPINION

No. 04-08-00677-CR

Romel **GARCIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 341st Judicial District Court, Webb County, Texas
Trial Court No. 2007-CRN-00628-D3
Honorable Elma Salinas Ender, Judge Presiding

Opinion by:   Catherine Stone, Chief Justice

Sitting:      Catherine Stone, Chief Justice
              Phylis J. Speedlin, Justice
              Marialyn Barnard, Justice

Delivered and Filed: March 10, 2010

AFFIRMED

Romel Garcia ("Romel") was found guilty by a jury of murdering Jose Hermergilio Lira and

was sentenced to 95 years confinement and fined $10,000. On appeal, Romel contends the trial court

erred by failing to suppress his statement to police because the interrogating officers ignored his

invocation of his right to counsel. We affirm the trial court's judgment.

### BACKGROUND

Pursuant to a warrant issued for his arrest, officers arrested Romel in Palestine, Texas for the murder of Jose Hermergilio Lira. Romel was transported to the Laredo Police Department after his arrest, where Officer Robert Garcia placed Romel in an interview room and administered *Miranda* warnings to him. Romel acknowledged he understood his rights and voluntarily waived his rights in writing. Officer Jorge Luna arrived shortly thereafter, and the officers reread Romel his rights.[1] Romel asked the officers if he could call his brother, stating "I don't know if I have my lawyer." The following then occurred:

| | |
|---|---|
| Officer Garcia: | Whichever way you want, bro. |
| Romel: | Can I use the — |
| Officer Garcia: | They will bring you the phone. As I've said, basically, what we want to know — you want to talk about or so — |
| Romel: | Yeah. Yeah. (Inaudible) — |
| Officer Garcia: | What's . . . it that you don't know? |
| Romel: | Well, it was an accident, sir. I was drunk and drugged because the day before they did a drive-by to me. It was Eddie Esparza. I don't know if you — it was Eddie Esparza and — |
| Officer Garcia: | Wait, wait, wait. Let me stop you first, okay? You want to talk to us first or you want to call to see if you have the attorney? What do you want to do? |
| Romel: | Well, let me use the phone to see. |
| Officer Garcia: | *Okay. And if they say that you have an attorney, do you still want to talk to us?* |

---

[1] Romel's interview with Officers Garcia and Luna was videotaped by police.

| | |
|---|---|
| Romel: | *Yes, the only thing is for him to be present, to see what's going on.* |
| Officer Garcia: | Whichever way you want. |
| Officer Luna: | We just want to know what happened?  We want — you want to give your side of the story of what happened? |
| Romel: | Yeah, but right now — |
| Officer Luna: | To hear your side, to see what happened and went by and everything. |
| Romel: | Yeah, I'm going to talk to you any way.  My life is the one that is on the line.  No one else's. |
| Officer Luna: | Uh-huh. |
| Officer Garcia: | It's up to you what you want.  Tell us, we talk, you tell us. This is your — we'll wait for you. |
| Romel: | Let me just make the phone call to my brother, if not  — |
| Officer Garcia: | Okay. Which brother are you calling? |
| Romel: | From here. If you want, I can call from here. |
| Officer Garcia: | No, bro, let me bring the cell phone, okay, (inaudible) — they brought your phone. . . . |

(emphasis added).  Officers Garcia and Luna then led Romel to another room, where he was allowed

to make a private telephone call.

Following his call, Romel allegedly told the officers "there was no attorney; no attorney to

represent him."[2]  The officers led Romel back to the interview room and continued their videotaped

---

[2] This conversation occurred outside the interview room and therefore was not captured on videotape.  Although Romel allegedly told officers "there was no attorney," Officer Garcia acknowledged that Romel never said anything about waiving his rights following the telephone call.

conversation with him. During the course of their conversation, Officer Garcia asked: "Well, bro, when we let you make the call, it's whatever you want, if you want to tell us your side of the story, so it's up to you. We'll talk to you, you tell us." Romel continued speaking with the officers and implicated himself in the shooting death of Lira.

Romel was subsequently indicted for murder. After his indictment, Romel filed a motion to suppress his statement to police, alleging the interrogating officers procured his statement after he had made an unambiguous and unequivocal request for an attorney. Romel claimed the admission of his statement would violate his rights under the Fifth and Sixth Amendments to the United States Constitution and article 38.22 of the Texas Code of Criminal Procedure. The trial court held a hearing and denied Romel's suppression motion. The trial court made findings of fact and conclusions of law in support of its ruling, which provide: (1) Romel's "statements to investigators did not constitute a clear and equivocal assertion of the right to counsel"; (2) Romel "did not properly invoke his Fifth Amendment right to counsel prior to giving [a] taped confession to [the] victim's murder"; and (3) the video recording of Romel's statement to investigators is admissible and not subject to suppression.

During trial, the jury heard Romel's statement as well as Officer Garcia's testimony concerning Romel's statement. The jury also heard Officer Garcia testify that several eye witnesses identified Romel as the gunman during a photographic lineup. The jury further heard that Lira's dying words to Officer Garcia indicated that an individual named "Romeo" had shot him.[3]

The jury also heard the testimony of several other witnesses, including Rogelio Garcia, Lilia Martinez, and Unice Rivera. Rogelio Garcia testified he was present at the time of the shooting. He

---

[3] Nothing in the record suggests Romel was also known as "Romeo."

indicated the shooting occurred outside his friend's party, where he had stopped to consume both drugs and alcohol. Rogelio explained he observed a woman from the party throw a beer at a van parked in the street. The woman then approached the van to confront its occupants. As the woman approached the vehicle, Romel passed Rogelio and stated, "[m]ove buddy, or you're going to get it." Romel looked angry and walked toward the street "in a very fast pace . . . to the back [of] the driver's side" of the van. Rogelio testified Romel tried to open the van's door, but the vehicle began to drive away. He then witnessed Romel fire a handgun multiple times at the vehicle and heard several rounds hit the van. Rogelio testified he later identified Romel as the gunman during a photographic lineup at the police station.

Lilia Martinez, Lira's friend, testified she was a passenger in Lira's vehicle prior to the shooting. She stated her sister, Unice Rivera, who was also a passenger in the vehicle, asked Lira to stop near a residence because she wanted to speak with two guys she knew. When Rivera exited the vehicle, she was approached by another woman, who had thrown a beer can in her direction. Martinez testified she went to get her sister and saw a man "running out of the house, pointing a gun." She stated the individual "just started blasting away like there was no tomorrow." Martinez testified she "got a really good look at" the shooter, whose face she described as "[c]areless" and "angry," because she was only "couple of feet" away from him. Martinez believed Lira was struck by the third round the gunman fired, and she testified that she tried to help Lira after she heard him scream. She stated the shooter kept firing rounds at the vehicle as she ran to help Lira, who was bleeding by the time she re-entered the vehicle. Martinez stated she drove Lira to a convenience store, where an unknown individual helped her get Lira to the hospital. She later identified Romel as Lira's assailant during a photographic lineup at the police station.

Unice Rivera, Martinez's sister, also testified at trial. Rivera provided testimony about her altercation at the residence and described the shooting. She stated Romel "seemed very angry" when he came out of the house, noting Romel briefly pointed his gun at her before he started firing at Lira's vehicle. Rivera stated Romel's target was Lira's vehicle and that he was shooting "and coming forward . . . like he really wanted . . . somebody dead." Rivera chased after Romel when he stopped firing at Lira, but had to stop chasing Romel because he tried to shoot her as well.[4] Rivera told the jury she remembered Romel's face "perfectly" because he "star[ed her] straight in the eye like he wanted [her] dead too." Rivera testified that she had identified Romel as the shooter during a photographic lineup following the shooting.

Lastly, Oziel Franco testified he was at the party when the shooting occurred. Although he did not see who fired the shots, Franco described what transpired after the shooting. Franco stated he and his female companion heard gunfire and decided to leave the party. As Franco and his companion were driving away, they encountered a male individual, who he later identified as Romel during a photographic lineup, running on a nearby street. Franco stopped to offer the individual a ride, and they drove off. After Romel got into Franco's truck, Franco heard "[s]ome kind of noise like a clip, some kind of a weapon." Franco asked Romel whether he was the one responsible for the gunshots and Romel responded that "he had shot to the air." When Franco dropped Romel off at his destination, Romel asked him to "keep the weapon for him." Franco refused and stated Romel vomited and left in an unknown direction.

---

[4] Rivera stated Romel's firearm went "click, click, click" and did not discharge when he pointed it at her.

At the conclusion of the trial, the jury found Romel guilty of the alleged offense. Romel was sentenced to 95 years imprisonment and fined $10,000 for his crime. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). When reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to determinations of historical facts, especially when those determinations involve assessment of witness credibility and demeanor. *Masterson v. State*, 155 S.W.3d 167, 170 (Tex. Crim. App. 2005). We give the same deference to determinations of mixed questions of law and fact if their resolution depends upon witness credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). However, we review *de novo* mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

If the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). If the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling so long as there is some support in the record. *Id.* at 818-19; *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). We will uphold a trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *St. George*, 237 S.W.3d at 725.

## DISCUSSION

Romel argues the trial court erred by not suppressing evidence obtained as a result of an unlawful interrogation conducted after he had invoked his right to counsel. He maintains his

interrogation violated his rights under the Fifth and Sixth Amendments to the United States Constitution as well as article 38.22 of the Texas Code of Criminal Procedure.

## A. Fifth Amendment

The Fifth Amendment requires officers to advise a suspect whom they have arrested that he has the right to remain silent and to have an attorney present during questioning. *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). The Fifth Amendment right to counsel will attach only when affirmatively invoked by the suspect. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). A suspect must unambiguously and unequivocally invoke his right to counsel before police interrogation must cease. *Dinkins v. State*, 894 S.W.2d 330, 351-52 (Tex. Crim. App. 1995). Not every mention of a lawyer will suffice to invoke the Fifth Amendment right to the presence of counsel during questioning. *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). "An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation." *Id.* Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding circumstances. *Davis v. United States*, 512 U.S. 452, 459 (1994); *Gobert*, 275 S.W.3d at 892. The test is an objective one: the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. "We look to the totality of circumstances to determine whether any statement referencing counsel was really a clear invocation of the Fifth Amendment right; we do not look to the totality of the circumstances, however, to determine in retrospect whether the suspect really meant it when he unequivocally invoked his right to counsel." *Gobert*, 275 S.W.3d at 893.

Once the suspect has invoked the Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates further communication, exchanges, or conversations with police. *Edwards*, 451 U.S. at 484-85; *Gobert*, 275 S.W.3d at 892. "[T]he impetus for the remarks must come from the suspect, not from police interrogation or conduct that is the functional equivalent of interrogation." *Martinez v. State*, 275 S.W.3d 29, 35 (Tex. App.—San Antonio 2008, pet. struck). "Once a suspect has clearly invoked his right to counsel, no subsequent exchange with the police (unless initiated by the suspect) can serve to undermine the clarity of the invocation." *Gobert*, 275 S.W.3d at 894-95 (discounting as immaterial to the analysis the court of appeals's observation that immediately after defendant clearly invoked right to counsel, he told the police that he was willing to talk to them in response to their questions "you don't want to talk?" and "you don't want to talk to us?"). Further, one officer's knowledge that a suspect has requested counsel is imputed to every other State agent. *Herron v. State*, 86 S.W.3d 621, 628 (Tex. Crim. App. 2002).

After Romel acknowledged understanding his rights, he told Officers Garcia and Luna that he wanted to call his brother to see if he had an attorney. He then told officers that if he learned from his brother that he had an attorney, he wanted counsel present "to see what's going on." Assuming, without deciding, Romel adequately invoked his right to counsel and that investigating officers improperly initiated further contact with Romel after he had invoked his right to counsel, the court's admission of Romel's confession did not constitute harmful error under the circumstances. *See Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) (assuming constitutional error in the admission of evidence and conducting harm analysis).

Having assumed a constitutional violation, such an error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). In determining whether constitutional error in the admission of evidence is harmless, we consider several factors, including the following: the importance of the evidence to the State's case; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; and any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). Additional factors we may consider include: the source and nature of the error; the emphasis placed upon the evidence by the State; the weight a juror may have placed on the evidence; and whether finding the error harmless would encourage the State to repeat the conduct. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). A constitutional error does not contribute to a conviction if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay*, 240 S.W.3d at 904.

Although a defendant's confession has the potential to have a profound impact on the jury, *see Ramos v. State*, 273 S.W.3d 356, 360 (Tex. App.—San Antonio 2008, pet. ref'd), we do not believe Romel's confession had such an impact in this case. The prosecution's case against Romel was strong absent his confession, which was fairly consistent with the accounts of the witnesses. The record reveals the State offered persuasive evidence of Romel's guilt from three different witnesses, who testified they had observed Romel aim and fire a gun at Lira's vehicle. At least two of these witnesses expressly testified they "got a really good look at" Romel or remembered his face "perfectly." The witnesses described Romel as angry at the time of the shooting or as having an

angry expression on his face. According to the witnesses, they saw Romel fire his weapon multiple times at Lira, with several stating they heard Romel's bullets strike Lira or his vehicle. One of the witnesses even testified Romel tried to shoot her, but failed to do so because he had run out of ammunition. The jury also heard testimony from a fourth witness, who testified he observed Romel running near the vicinity of the shooting. When Romel was picked up by this witness, Romel possessed a firearm and admitted to having just fired the weapon. None of the witnesses' credibility was seriously undermined by defense counsel during trial, and their testimony undoubtedly damaged Romel more than any statement contained within his confession.

We acknowledge that the prosecution mentioned Romel's confession several times during its opening and closing statements, noting that even Romel himself told you "I shot." The prosecutor, however, did not emphasize the confession as the cornerstone to conviction, but rather as evidence to suggest the jury should rely on the testimony of the witnesses it had presented. Romel's confession was not critical to the State's case, and we cannot say its admission harmed Romel under the circumstances. Romel's second issue is overruled.

**B. Sixth Amendment**

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel" for his defense. U.S. CONST. amend. VI. The right to counsel provided by the Sixth Amendment attaches only after the initiation of "adversary judicial proceedings" against a suspect, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). The record, however, fails to affirmatively show any adversarial criminal proceedings had been initiated against Romel at the time he made his statement to the investigating

officers. Because no adversarial criminal proceedings had been initiated against Romel at the time of his statement, he had no Sixth Amendment right to counsel. *See id.* Nevertheless, even if the record had shown Romel's Sixth Amendment right had attached, we would overrule Romel's complaint for the same reasons expressed in our analysis of his Fifth Amendment challenge. Romel's first issue is overruled.[5]

## C. Article 38.22 of the Texas Code of Criminal Procedure

Article 38.22, section 3 of the Texas Code of Criminal Procedure governs the admissibility of the oral statements of the accused. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (Vernon 2005). It provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against him in a criminal proceeding unless, prior to the statement but during the recording, he is given the warning provided in section 2(a) and he knowingly, intelligently, and voluntarily waives the rights set out in the warning. *Id.* § 3(a)(2). Strict compliance with section 3(a) is required. *Id.* § 3(e); *Woods v. State*, 152 S.W.3d 105, 116 (Tex. Crim. App. 2004).

Romel argues his statement to police is inadmissible because officers resumed questioning him following his invocation of his right to counsel without obtaining the required waivers of his rights. Even if we assume Romel's statutory rights were violated, the admission of Romel's statement constitutes harmless error. As discussed more fully above, we do not believe the admission of Romel's statement contributed to his conviction. Romel's third issue is overruled.

### CONCLUSION

---

[5] Romel raises a fourth issue on appeal, complaining about the trial court's failure to enter a finding that he "had a right to counsel during the taking of the video-taped statement by virtue of the Fifth and Sixth Amendments to the United States Constitution." We reject Romel's argument, which is essentially an attempt to recast his Fifth and Sixth Amendment arguments in a different light, for the same reasons discussed above.

Based on the foregoing, the judgment of the trial court is affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH