AFFIRMED; Opinion Filed July 11, 2013.



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00908-CR**

**KEVIN MONROE AMOS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-34685-U**

## OPINION

Before Justices Bridges, Lang, and Myers
Opinion by Justice Lang

Following a plea of not guilty, appellant Kevin Monroe Amos was convicted by a jury of murder. Appellant pleaded true to two enhancement paragraphs, and the jury found those enhancement paragraphs true. Punishment was assessed by the jury at sixty years' confinement.

On appeal, appellant asserts two issues. We construe those two issues to complain of error by the trial court in denying appellant's motion to suppress a statement made by him that he contends was elicited unlawfully.[1] We decide against appellant on his two issues. The trial court's judgment is affirmed.

---

[1] Appellant's two issues are stated in his appellate brief as follows: (1) "A statement by Appellant, relied on at trial by the prosecution, was elicited in violation of Tex. Code. Crim. Proc. Ann. article 38.22 in that it was obtained without appellant's express waiver of his right to remain silent" and (2) "A statement by Appellant relied on at trial by the prosecution, was elicited in violation of Tex. Code Crim. Proc. Ann. article 38.22 in that it was obtained despite Appellant's invocation of his right to remain silent at the outset of interrogation." (emphasis original). *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005). Appellant does not assert any specific error by the trial court in his issues. However, in the argument section of his brief, appellant states, "The issue is whether the Trial Court committed error by denying Appellant's motion to

## I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case alleged that on approximately June 21, 2011, appellant committed murder by striking the complainant, Pamela Wilson, with a hammer. Appellant filed a pretrial "Motion for Hearing on Voluntariness of Any Admission or Confession Whether Written or Oral." Following voir dire, but before the guilt/innocence phase of trial began, the trial court held a hearing outside the presence of the jury respecting the voluntariness of a June 23, 2011 oral statement made by appellant to police.

During that hearing, Don Cawthon, a detective with the Irving Police Department, testified an aggravated robbery occurred on the night of Monday, June 20. Cawthon stated police "had it on video" and knew appellant committed that robbery. Appellant was apprehended when he called 911 on the Wednesday evening following the robbery. According to Cawthon, during the 911 phone call, appellant "said he had murdered someone" and "was able to give the name and address where the homicide had taken place." Following appellant's arrest on Wednesday night, Cawthon "contacted him at his jail cell" and "pulled him out." Cawthon stated he told appellant they were going "upstairs" to "talk about this." Cawthon testified appellant said he was "too tired to talk right now." According to Cawthon, appellant told him, "Let me get some sleep and I'll talk to you tomorrow." Cawthon "released him back to the cell" and went home. The next morning, Cawthon brought appellant to an interview room and gave him "Miranda warnings." Cawthon testified that the offense appellant was "actually in jail for at that point" was aggravated robbery.

A video recording of Cawthon's interview with appellant was admitted into evidence for purposes of the hearing and viewed by the trial court. The video recording was "redacted" to

---

suppress the statements pursuant to the rule of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and <u>Tex. Code Crim. Proc. Ann. article 38.22</u>." (emphasis original). We construe his issues accordingly. *See* Tex. R. App. P. 38.1(f); 38.9.

eliminate references to offenses other than that charged in this case. Additionally, an "unofficial" transcript of the video recording, with the "redactions" marked, was admitted into evidence for "demonstrative purposes" and reviewed by the trial court.

The video recording and transcript showed that at the start of the interview, Cawthon read appellant his "rights" and stated, "You understand all that?" Appellant nodded. Then, the following exchange occurred:

| | |
|---|---|
| CAWTHON: | Ok. And, you understand what you're in jail for? What, what'd you call us about last night? |
| APPELLANT: | Something else. |
| CAWTHON: | What—what else? |
| APPELLANT: | Don't want to talk about it right now. |
| CAWTHON: | Alright. |
| APPELLANT: | Honestly, so it's not—I don't know what y'all found and I don't know what's going on. |
| CAWTHON: | Well, what's going on with you? |
| APPELLANT: | I don't know, maybe I'm hallucinating or something, I don't know. But, we'll see. |

Appellant continued answering general background questions and questions about the robbery. Approximately six minutes later in the interview, Cawthon again asked appellant about the murder. Appellant responded in part, "I can't, I can't share nothing about nothing that's not occurred yet, so the time occurs that I'm charged with something et cetera, et cetera, then I can't speak on that. That makes sense?" The interview continued for approximately one and one-half hours. During that time, appellant stated that he hit the complainant three times with a hammer, then took computer equipment and the keys to a car belonging to the complainant's husband from the complainant's apartment. Further, appellant stated in the interview that he pawned some of the computer equipment and left the car "on the side of the road in the flood."

Cawthon testified that when appellant said, "Don't want to talk about it right now," that meant to him appellant "just wasn't prepared to discuss [the murder] at that point in time." According to Cawthon, appellant was willing to talk about the robbery and did discuss the robbery.

On cross-examination, Cawthon testified he did not ask appellant if he was willing to waive his "Miranda rights." Cawthon stated appellant "nodded that he understood the rights" and then they began to talk. Cawthon testified he did not think appellant was terminating the interview when he said, "Don't want to talk about it right now." Cawthon stated he continued questioning appellant after appellant made that statement. Additionally, Cawthon acknowledged that approximately six minutes later in the interview, appellant indicated to him "that he wasn't going to talk about anything he wasn't charged with." Cawthon stated he did not feel that was a termination of the interview.

Counsel for appellant argued during the hearing as follows:

> He asked Mr. Amos, You want to talk about why you called us last night?
> Mr. Amos told him he didn't want to talk about it right now. I think once he's been read his rights and told he can terminate the interview at any time, and he says, I don't want to talk about it right now, I think that's a termination of the interview.
> And you know, the detective keeps talking to him, and still keeps focusing on the murder case, not anything else. Talks to him about background.
> And then we get to 10:56 or thereabouts, on Page 6 of the transcript, Mr. Amos says, I can't—I can't share nothing about nothing that's not occurred yet. So the time occurs that I'm charged with something, et cetera, et cetera, then I can't speak on that. That make sense?
> And essentially the conversation is, you know, he's willing to talk about the robbery; he's not willing to talk about anything else. So once again, I think he's terminating the interview at that point in time.

Additionally, after both sides rested and closed at the hearing, counsel for appellant argued

> Judge, under 3822, accused has to knowingly, intelligently and voluntarily waive their right set out in the warnings under 3822 Miranda warnings. That's not reflected in the video nor in the transcript that he's waived any of those rights. He

–4–

was never asked if he's waiving those rights and wishes to speak to the detective. Rather, the detective asked him a couple of questions and the Defendant immediately says he doesn't want to talk about that.

We believe that that constitutes a request to terminate the interview at that point in time. And we feel he further does that again at 10:56 where he indicates that he doesn't want to talk about anything.

You know, I don't know how else you terminate an interview other than saying I don't want to talk about it. We would submit they haven't complied with 3822. The video doesn't comply with 3822. We ask the Court to suppress this statement.

The State responded in part

[T]he fact that [appellant] is so willing to talk about the robbery indicates that he specifically was not attempting to end the interview, because he'll follow up saying, well, I can't talk about that, but, hey, if you want to talk about the robbery, I'll talk about the robbery.

He's not in any way trying to end the interrogation. He's just trying to steer what the conversation is about.

The trial court stated, "The Court does find that the statement was made voluntarily and is going to admit it before the jury." Further, the trial court stated it would allow the redacted transcript to be offered into evidence for "demonstrative purposes."

Following that hearing, the jury returned to the courtroom and the guilt/innocence phase of trial commenced. In its opening statement, the State described the evidence to be presented and asserted in part

You're also going to hear the words of Kevin Amos himself in a recorded statement that he gave to police officers after he was arrested. You're going to hear him detail how he knew Pam Wilson. How they had been friends for eight years. How she had given him a place to stay when no one else would. How he had been living with her at her apartment in Irving for over a month, and how on that morning of June 20th, 2011, he became upset with her, and how he struck her with that hammer until she was dead.

Brenda Neese testified she is a dispatcher with the Irving Police Department. She stated that on the evening of June 22, 2011, she received a 911 call from a male caller who informed her that he needed to report that he had killed someone. The caller identified himself as "Kevin Amos." Neese testified the caller (1) informed her that he was calling from a Texaco station at

–5–

the corner of Beltline and Northgate and (2) described the clothing he was wearing. An audio recording of the 911 call was admitted into evidence and published for the jury. Additionally, a transcript of the call was admitted into evidence for "demonstrative purposes."

In the audio recording of the 911 call, the caller stated in part that he "killed someone" "about three days ago" at 3833 Beltline Road, apartment 2102, in Irving. The caller identified the person he had killed as "Pamela Wilson Malla" and identified himself as "Kevin Amos." Further, when asked how the incident happened, the caller stated in part, "I got in a rage and lost control."

Officer Allan Lotspeich of the Irving Police Department testified that on the evening of June 22, 2011, he heard a call over the police radio dispatching police to the Texaco gas station at Beltline and Northgate "regarding someone who had called 911 to state they had killed someone." Lotspeich testified he was approximately 100 to 150 yards away from that Texaco station when he heard the call. He immediately pulled into the parking lot at the Texaco station and "approached the store." Lotspeich testified he saw appellant standing inside the store at the Texaco station, dressed in clothing that matched that described in the call. Appellant was holding a beer in one hand and a phone in the other hand. According to Lotspeich, appellant stated he was the one who had called police. Lotspeich detained and searched appellant. Then, Lotspeich testified, appellant was arrested and "transported to the jail for another outstanding charge." According to Lotspeich, a "Visa Paypal card" bearing the name "Pamela Wilson" was found in appellant's pocket. The card was admitted into evidence.

Linda Tirado testified she is a sister of "Pamela Wilson Malla." Tirado identified photographs of her sister before and after her death. The photographs were admitted into evidence and published for the jury.

Officer Quang Nguyen of the Irving Police Department testified that on June 21, 2011, he was dispatched to "an unconscious person call" at 3833 North Beltline Road, apartment 2102, in Irving. When he arrived, paramedics on the scene told him "the person was already dead." Nguyen testified the complainant's husband, Ram Malla ("Malla"), and Malla's brother were at the apartment. Nguyen stated he "did a protective sweep" of the apartment and "cleared out everybody" to "preserve the crime scene." Photographs of the crime scene were admitted into evidence and published to the jury. On cross-examination, Nguyen testified Malla stated he was staying nearby with his brother and had come to the apartment to retrieve his car. According to Nguyen, Malla "was crying, but he didn't have any tears."

Officer Brett Behrends testified he is a crime scene investigator with the Irving Police Department. On June 21, 2011, he responded to a call regarding "an unconscious person" at 3833 North Beltline Road, apartment 2102. He testified that when he arrived, he was told by another police officer that "there was a deceased female inside the location." Behrends stated he took photographs of the body and the crime scene and looked for evidence. He testified the complainant was in the bedroom, lying face down on the floor. A hammer was found near the complainant's head. According to Behrends, it appeared that the complainant's death had been caused by being struck on the back of the head with a hammer. Additionally, Behrends testified there was no visible sign of forced entry.

Cawthon testified that at approximately 11 p.m. on June 21, 2011, he responded to a call regarding "a body in an apartment." He obtained a search warrant and viewed the crime scene. According to Cawthon, the initial suspect in this case was Malla because "he located the body" and "[t]hey were estranged at the time." Cawthon testified Malla stated he had gone to the complainant's apartment to retrieve his vehicle, but discovered the vehicle was missing. Cawthon stated police were able to link Malla's vehicle to a traffic stop that had taken place "the

night prior." Cawthon testified the "name associated with that traffic stop" was Kevin Amos. On the evening of June 22, Cawthon was contacted and informed that appellant had been arrested. Cawthon stated he attempted to question appellant that night, but appellant said he was too tired, so Cawthon let him sleep.

Cawthon testified he interviewed appellant on June 23 at approximately 10 a.m. or 11 a.m. The interview lasted less than two hours. Cawthon testified he was able to "ascertain" from appellant that appellant and the complainant were "very close friends, but nothing romantic" and appellant had been staying with the complainant recently. According to Cawthon, appellant told him that he struck the complainant in the head three times with a hammer. Cawthon stated, "From the best I can tell, he felt that she was videotaping and had listening devices, and that he just didn't like the fact that he thought she was sharing some information." Also, Cawthon stated there was "indication" of drug use.

A copy of the video recording of Cawthon's interview with appellant, "redacted" as described above, was admitted into evidence and published for the jury. Additionally, a transcript of that video recording was admitted into evidence for "demonstrative purposes."

Cawthon testified police were able to confirm appellant pawned the complainant's computer equipment and abandoned Malla's car as he described in the interview. On cross-examination, Cawthon testified he received a report from the forensic examiner "in regards to what was on [the complainant's] computer." Cawthon stated there were pornographic images and photographs of drugs on the computer.

A surveillance video of a man selling computer equipment to an employee at Top Dollar Pawn on June 20, 2011, was admitted into evidence and published for the jury. Additionally, medical records of appellant from Parkland Medical Hospital dated June 21, 2011, were admitted into evidence and published for the jury. The records stated, in part, that appellant was "found

–8–

walking on the freeway in disorganized fashion" and told police he "wanted to be shot or tased." Further, the records stated appellant reported he had used drugs recently, including cocaine and methamphetamine, and had not slept in several days. Appellant was discharged from the hospital on June 22, 2011.

Officer Joseph Reagey of the Irving Police Department testified that at approximately 1:50 a.m. on June 21, 2011, he observed a white vehicle that appeared to be swerving on Irving Boulevard. Reagey stated he "conducted a normal traffic stop" of the vehicle. He testified the driver was appellant. Reagey stated appellant told him that his license was suspended. Appellant had a "Texas ID card." According to Reagey, appellant did not seem "agitated" or "combative." Reagey stated he saw a "tire iron" on the front passenger seat. Reagey asked for consent to search the vehicle and appellant said "no." Reagey testified he told appellant to "get his license taken care of," then "let him go" without issuing a ticket. A video recording of the traffic stop was admitted into evidence and published for the jury.

Tracy Dyer testified she is a staff medical examiner with the Dallas County Medical Examiner's Office. She stated that on June 22, 2011, the complainant's body was brought into the medical examiner's office for an autopsy. According to Dyer, the complainant had no "defensive-type wounds." Dyer testified the complainant had seven "laceration" wounds on her head "from being struck by a hard implement." Dyer stated that five of those injuries "fractured the underlying occipital bone," which is the "hardest" part of the skull. Dyer testified the complainant's wounds were consistent with "having possibly been caused" by a hammer. Dyer stated the cause of death in this case was "blunt-force head injuries." The autopsy report and photographs taken during the autopsy were admitted into evidence.

The charge of the court contained jury instructions pertaining to the charged offense of murder and the lesser included offense of manslaughter. Specifically, with respect to murder, the

jury was charged that "[a] person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual."

During closing argument, the State asserted there are "three different ways" to prove murder and all of them were proven in this case. Specifically, the State argued the evidence showed the complainant's death was caused by appellant intentionally, knowingly, and as a result of a dangerous act intended to cause serious bodily injury. Further, the State asserted in part

> And it isn't folks—you guys have seen the video—that he walked in there remorseful; that he walked in there ready to outline in clear detail what he did. The detective, a very thorough detective, somebody who was engaged in relentless pursuit of the truth, God bless him for that, because he almost got there.
> Kevin wouldn't let him. Three times is what he said. After pulling teeth, three times is what he said and you know that's not true.

Additionally, on rebuttal, the State argued

> Then we got to listen later on to the statement that he gave to Detective Cawthon, and he told you not only who he killed, but when he killed her, where he killed her, how he killed her, and he told you why he killed her. There's really not anything left to talk about.
> . . . .
> The evidence is clear. This was intentional. It was knowing. To say that, again, I was high, I was tired, I didn't want it to happen doesn't take away from the fact that during the course of this murder, during the course of everything that Kevin Amos did to Pamela Wilson, he knew what he was doing. And we know about it because he knew what he had done. He doesn't claim that he somehow blacked out of what happened, you know, that he blanked out, he doesn't recall anything about what happened. He remembers every hammer strike that he brought down on her head, and that's clear from his statement.

Counsel for appellant stated in part during closing argument that appellant hit the complainant with a hammer, but "never intended to kill her." According to appellant's counsel, appellant was "guilty of manslaughter" rather than murder.

After the jury found appellant guilty of murder, the punishment phase of trial commenced. Ronnie Tolenna testified she is a sales associate at a 7-Eleven store in Irving.

Tolenna stated that at approximately 2:30 a.m. on June 21, 2011, appellant approached the counter and yelled at her to open the register and give him all the money inside. According to Tolenna, appellant had "something like a metal bar" and she became scared when she saw it. Tolenna gave appellant the money and he left the store and drove away in a white car. A video recording of the robbery was admitted into evidence and published for the jury.

Willie Washington testified he is a deputy with the Dallas County Sheriff's Department and works in the "identification section." Washington testified appellant's fingerprints matched those in "penitentiary packets and certified convictions" respecting (1) three instances of unlawful delivery of a controlled substance, (2) second degree robbery, (3) burglary of a habitation, and (4) misdemeanor assault. The penitentiary packets pertaining to those offenses were admitted into evidence.

Cawthon testified that during his June 23, 2011 interview with appellant described above, appellant admitted committing the robbery for which he had been arrested and stated that he met the complainant when they were arrested together on a narcotics search warrant. Portions of the video recording of that interview that had previously been "redacted" were played for the jury. Additionally, corresponding portions of the transcript of the video recording were admitted into evidence. In those portions of the video recording, appellant states (1) he committed a robbery at a 7-Eleven store on the previous Monday night and (2) he met the complainant through "drug dealing."

Appellant testified the complainant was his "best friend." He stated in part (1) "[t]his is not something that I did intentionally"; (2) "I wasn't in my right mind"; and (3) "I have no idea what I was doing."

During closing argument in the punishment phase of trial, the State argued in part that appellant should receive the maximum sentence of life imprisonment. Counsel for appellant argued that "an appropriate sentence in this case" would be thirty years.

After the jury assessed punishment at sixty years' confinement, appellant filed a timely motion for new trial, which was denied by the trial court. This appeal timely followed.

## II. DENIAL OF APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT

### A. Standard of Review

An appellate court reviews a trial court's pretrial suppression ruling under a bifurcated standard. *Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013). We give almost total deference to a trial court's determination of historical facts and mixed questions of law and fact that rely upon the credibility of a witness. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). However, we apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.*; *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

Generally, appellate review of a trial court's ruling on a motion to suppress is limited to the record as it existed at the time of the suppression hearing. *See O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000). Further, "if the trial court's ruling regarding a motion to suppress is reasonably supported by the record and is correct under any theory of law applicable to the case, the reviewing court must affirm." *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

### B. Applicable Law

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the Fifth Amendment to the United States Constitution prohibits use of an accused's oral statement made as result of custodial interrogation unless he is given certain warnings and

knowingly, intelligently, and voluntarily waives the rights set out in the warnings. *See* 384 U.S. at 478–79. Specifically, pursuant to *Miranda*, an accused must be warned prior to any questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479.

Article 38.21 of the Texas Code of Criminal Procedure provides "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). Under article 38.22, no oral statement of an accused made as a result of custodial interrogation shall be admissible against an accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a); *Joseph v. State*, 309 S.W.3d 20, 23–24 (Tex. Crim. App. 2010). The warnings required by article 38.22 include those stated in *Miranda* and, in addition, a warning that the accused "has the right to terminate the interview at any time." TEX. CODE CRIM. PROC. ANN. art. 38.22 §§ 2(a), 3(a)(2); *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

The State has the burden of showing by a preponderance of the evidence that an accused knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See Joseph*, 309 S.W.3d at 24. "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. at 25. Additionally, "the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. In making a

–13–

determination as to waiver, "the totality of the circumstances surrounding the interrogation" must be considered. *Id.*

"Although desirable, the general rule is that neither a written nor an oral express waiver is required." *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988); *accord Joseph*, 309 S.W.3d at 24. "True, 'a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.'" *Joseph*, 309 S.W.3d at 24 (quoting *Miranda*, 384 U.S. at 475). "But a waiver need not assume a particular form and, in some cases, a 'waiver can be clearly inferred from the actions and words of the person interrogated.'" *Id.* (quoting *N. Carolina v. Butler*, 441 U.S. 369 (1979)); *see Barefield v. State*, 784 S.W.2d 38, 40–41 (Tex. Crim. App. 1989), *overruled on other grounds, Zimmerman v. State*, 860 S.W.2d 89, 94 (Tex. Crim. App. 1993).

If a statement is governed by *Miranda*, a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible. *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). "But, an officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks." *Id.* (citing *Davis v. United States*, 512 U.S. 452 (1994)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2259–60 (2010). The question of whether an accused has invoked the right to remain silent must be "decided on the totality of the circumstances in that particular case." *Watson*, 762 S.W.2d at 597.

The admission into evidence of a statement taken in violation of *Miranda* rights is constitutional error subject to harmless error review. *See* TEX. R. APP. P. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003). When confronted with such an error, we must reverse unless we conclude beyond a reasonable doubt that the error did not contribute to

–14–

appellant's conviction or punishment. TEX. R. APP. P. 44.2(a); *Snowden v. State*, 353 S.W.3d 815, 818, 822 (Tex. Crim. App. 2011); *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt. *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). Our focus is on the error itself in the context of the trial as a whole, to determine the likelihood that the error "genuinely corrupted the fact-finding process." *Snowden*, 353 S.W.3d at 819; *see also Clay*, 240 S.W.3d at 904 (entire record must be considered in harmless error analysis). We consider the nature of the error, the extent it was emphasized by the State, the probable implications of the error, and the weight a juror would probably place on the error. *Snowden*, 353 S.W.3d at 822. These factors are not exclusive and other considerations may logically inform our harm analysis. *Id.* Further, when assessing the impact of the court's erroneous admission of evidence, we look at the importance of the evidence to the State's case, whether the evidence was cumulative of other evidence, the presence or absence of other evidence corroborating or contradicting the evidence on material points, the overall strength of the State's case, and any other factor revealed by the record that may shed light on the probable impact of the error on the jury. *Clay*, 240 S.W.3d at 904. "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment." *Snowden*, 353 S.W.3d at 822. A constitutional error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay*, 240 S.W.3d at 904; *Ramos v. State*, 273 S.W.3d 356, 359 (Tex. App.—San Antonio 2008, pet. ref'd).

A person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

### C. Application of Law to Facts

#### 1. Requirement of Express Waiver

In his first issue, appellant contends his June 23, 2011 oral statement to police was elicited in violation of *Miranda* and article 38.22 "in that it was obtained without [his] express waiver of his right to remain silent." According to appellant, "[t]he trial court found an implied waiver was given based on the totality of the circumstances."[2] However, appellant contends, "this Court should require an express waiver under <u>article 38.22</u>." (emphasis original). Appellant states he "argues here for a change" in the "'general rule' of waiver." In support of his argument, appellant cites a concurring opinion in *Joseph*. *See Joseph*, 309 S.W.3d at 28–29 (J. Cochran, concurring) ("law-enforcement officers are well advised to expressly ask a suspect to waive his *Miranda* rights so as to avoid later, protracted litigation and the very real possibility that a suspect's statement must be excluded because the totality of the circumstances are insufficient to meet the State's 'heavy burden' to show an implied waiver").

The State asserts that "[w]hile Appellant did not expressly waive his *Miranda* rights, an express waiver is not required under Article 38.22." According to the State, "[d]espite

---

[2] Section six of article 38.22 provides in part that if a statement of an accused is found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, "the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause." TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6; *see also Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004) ("It is well settled that Article 38.22, § 6 is mandatory in its language and that it requires a trial court to file its findings of fact and conclusions of law regarding the voluntariness of a confession whether or not the defendant objects to the absence of such omitted filing."). The record shows that at the conclusion of the hearing respecting appellant's statement, the trial court stated it "does find that the statement was made voluntarily and is going to admit it before the jury." The record does not show an order was "entered" pursuant to section six of article 38.22. However, the findings of fact and conclusions of law need be made only when there is a question as to the facts surrounding the taking of the statement, i.e., where the facts are disputed. *See Miller v. State*, 666 S.W.2d 269, 274 (Tex. App.—Dallas 1984, pet. ref'd); *Zervos v. State*, 15 S.W.3d 146, 154 (Tex. App.—Texarkana 2000, pet. ref'd). In the case before us, the record shows the facts surrounding the taking of the recorded statement are not in dispute. *See Zervos*, 15 S.W.3d at 154. Rather, the only dispute is the interpretation of the statements and actions of appellant that are shown conclusively by the video recording. *Id*. Therefore, we conclude that a more specific finding by the trial court is not necessary in this case. *See id*.; *Hernandez v. State*, 387 S.W.3d 881, 888 (Tex. App.—San Antonio 2012, no pet.).

Appellant's argument in favor of requiring an express waiver of *Miranda* rights, that is not the current state of the law, which this Court is bound to follow."

Under the law respecting waiver of the rights in question, "neither a written nor an oral express waiver is required." *Joseph*, 309 S.W.3d at 24; *Watson*, 762 S.W.2d at 601; *see also Berghuis*, 130 S.Ct. at 2261. We decline to make the "change" in the law requested by appellant. *See Flores v. State*, 883 S.W.2d 383, 385 (Tex. App.—Amarillo 1994, pet. ref'd) ("As an intermediate appellate court, we are duty bound to follow the law declared by the Texas Court of Criminal Appeals on matters pertaining to the enforcement of criminal laws . . . ."); *see also Joseph*, 309 S.W.3d at 24 n.5 (rejecting appellant's request to require "affirmative acknowledgement" of waiver of article 38.22 rights); *Barefield*, 784 S.W.2d at 41 (rejecting appellant's argument that article 38.22 should be construed to require that electronically recorded confessions contain an express waiver of rights).

### 2. Invocation of Right to Remain Silent

In his second issue, appellant asserts he "expressly invoked his right to remain silent at the outset of the interrogation" and therefore "[t]he subsequent confession was inadmissible." Specifically, appellant contends he "unambiguously invoked his right to remain silent when he told Detective Cawthon he did not want to talk about the murder of Pamela Wilson, 'right now.'"

The State responds, "Appellant's ambiguous statement that he did not want to talk about Pamela Wilson's murder 'right now' was not an unambiguous invocation of his right to remain silent." Rather, the State asserts, appellant's statement "indicated that he was willing to talk to the detective about the murder, but he wanted to talk about the robbery first." According to the State, "Detective Cawthon was not required to end his interrogation of the Appellant and the trial court did not err in admitting the Appellant's statement."

The record shows that at the hearing on the admissibility of appellant's statement, Cawthon testified that at the time of the interview in question, the offense appellant was "actually in jail for at that point" was aggravated robbery. After Cawthon read appellant his "rights" at the start of the interview, the following exchange occurred:

CAWTHON:     Ok. And, you understand what you're in jail for? What, what'd you call us about last night?

APPELLANT:     Something else.

CAWTHON:     What—what else?

APPELLANT:     Don't want to talk about it right now.

CAWTHON:     Alright.

Appellant continued answering general background questions and questions about the robbery. Based on the totality of the circumstances, we cannot conclude appellant "unambiguously invoked his right to remain silent" when he stated, "Don't want to talk about it right now." *See Dowthitt*, 931 S.W.2d at 257; *Watson*, 762 S.W.2d at 597; *see also Hernandez-Sandoval v. State*, No. 07-11-00085-CR, 2012 WL 3870306, at *4–*5 (Tex. App.—Amarillo Sept. 6, 2012, pet. ref'd) (mem. op., not designated for publication) (where accused was questioned about murder and responded he didn't "want to talk about it right now," but continued to answer other questions, accused's response indicated he "simply wanted to redirect the conversation" and was not unambiguous invocation of his right to remain silent).

### 3. Harmless Error

Notwithstanding our conclusions stated above, we address the proposition of harm. The State contends that even if the trial court erred by denying appellant's motion to suppress, any error was harmless "[i]n light of the evidence of Appellant's guilt." Appellant does not specifically address harm. However, appellant asserts in his brief in this Court that "[t]he central

evidence in this case is the confession Appellant gave to Detective Cawthon while he was in custody."

The alleged error in this case was the trial court's denial of appellant's motion to suppress his oral statement in which he confessed to hitting the complainant three times with a hammer and described other details pertaining to that incident. As described above, the trial court admitted a "redacted" video recording and transcript of appellant's statement into evidence during the guilt/innocence phase of trial and admitted additional portions of appellant's statement into evidence at the punishment phase of trial. Further, the State referred to the statement during its opening statement and closing argument in the guilt/innocence phase.

As the Fourth District Court of Appeals in San Antonio astutely observed, "In some cases a defendant's own confession is 'the most probative and damaging evidence that can be admitted against him.'" *Ramos*, 273 S.W.3d at 360 (quoting *McCarthy*, 65 S.W.3d at 57). However, in this case, appellant's statement to police was not the only evidence of a confession by him. *See id.* (concluding beyond reasonable doubt that erroneous admission of appellant's confession into evidence did not contribute to appellant's conviction or punishment where evidence included other statements by appellant "effectively admitting" same acts described in confession). The evidence included an audio recording of a June 22, 2011 call to 911 in which the caller identified himself as "Kevin Amos," stated he had killed someone "about three days ago," and gave the complainant's name and the address where her body was found. Additionally, (1) Neese testified as to receiving that 911 call and (2) Lotspeich testified appellant stated to him that he was the person who had called police. Further, (1) the evidence showed appellant had the complainant's "Visa Paypal card" at the time he was apprehended and had used a car belonging to the complainant's husband on June 21, 2011, which added to the strength of the State's case, and (2)

–19–

the State's references to the video recording in its opening statement and closing argument were brief. *See id.* at 360–61.

Finally, the evidence presented during the punishment phase of trial included Tolenna's eyewitness testimony respecting the June 21, 2011 7-Eleven robbery committed by appellant, a video recording of that robbery, and penitentiary packets pertaining to other convictions of appellant, including three related to drug offenses. Therefore, the portions of appellant's statement admitted into evidence during the punishment phase of trial were merely cumulative of other evidence. *See Jones*, 119 S.W.3d at 780–83; *Ramos*, 273 S.W.3d at 362.

On this record, we conclude beyond a reasonable doubt that any error by the trial court in denying appellant's motion to suppress did not contribute to appellant's conviction or punishment. *See* TEX. R. APP. P. 44.2(a).

### III. CONCLUSION

We decide against appellant on his two issues. Further, we conclude any error by the trial court in denying appellant's motion to suppress was harmless beyond a reasonable doubt.

The trial court's judgment is affirmed.

Do Not Publish
TEX. R. APP. P. 47.2
120908F.U05

/Douglas S. Lang/
_____
DOUGLAS S. LANG
JUSTICE

–20–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

KEVIN MONROE AMOS, Appellant

No. 05-12-00908-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-34685-U.
Opinion delivered by Justice Lang. Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 11th day of July, 2013.


/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE