

# NUMBER 13-24-00230-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LUIS GERARDO LUGO PENA,                                          Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## ON APPEAL FROM THE 206TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Cron, and Fonseca**
**Memorandum Opinion by Justice Silva**

Appellant Luis Gerardo Lugo Pena was indicted for aggravated robbery, a first-degree felony. *See* TEX. PENAL CODE § 29.03(a)(3)(A), (b). The indictment contained one enhancement paragraph alleging that Pena had previously been convicted of a felony offense. *See id.* § 12.42(c)(1). Following a jury trial, he was found guilty and was

sentenced to fifteen years' imprisonment. By two issues, Pena argues (1) the trial court committed error when it failed to conduct a hearing pursuant to Texas Code of Criminal Procedure Article 38.22 concerning the voluntariness of his statement to police, and (2) he received ineffective assistance of counsel. We affirm.

## I.    BACKGROUND

The indictment alleged that Pena, on or about September 29, 2023, "did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly cause bodily injury to Miguel Martinez Aguirre, a person 65 years of age or older, by striking him with his hand." *See id.* § 29.03(a)(3)(A). The indictment also alleged that prior to the commission of the aggravated robbery, Pena was convicted of the felony offense of possession of a controlled substance on April 6, 2022. *See id.* § 12.42(c)(1); TEX. HEALTH & SAFETY CODE § 481.115(d). On April 1, 2024, Pena filed a motion to suppress alleging in part that "he was under coercive custodial interrogation" and that any statements obtained from him by police were "in violation of Article 38.22 of the Texas Code of Criminal Procedure."[1]

A jury was subsequently empaneled on April 9, 2024, and a jury trial commenced that same day. In a trial spanning over three days, twelve witnesses testified and over a hundred exhibits were admitted. We summarize the relevant testimony and evidence below.

---

[1] The appellate record is devoid of any indication that the trial court held a hearing or ruled on Pena's motion to suppress.

2

**A. Lay Witness Testimony**

**1. Natalie Ortiz**

Natalie Ortiz testified that on September 29, 2023, she was having problems "with the brakes and the lug[ ]nuts" on her van. She explained that Pena was a friend of hers and that she had known him for eleven years. Ortiz allowed Pena to take possession of her van around 7:00 or 7:30 that morning "because he was working on it," and the lug nuts fell off shortly after. Ortiz further testified that her van broke down near a restaurant in Edinburg. Pena called Ortiz and she picked him up from the restaurant in her friend's vehicle and drove him to Advance Auto Parts to purchase lug nuts for her van. A photograph of the receipt related to the transaction was admitted into evidence. Ortiz stated that after the trip, she dropped Pena back off at the restaurant around 8:15 or 8:30 a.m. and that he was the last person to be in possession of her van that day. Ortiz also identified Pena in a photograph admitted into evidence which depicted him sitting in the driver's seat of her van.

**2. Manuel David Herrera Jr.**

Manuel David Herrera Jr. testified that he observed a van occupied by two individuals parked in front of the home of Moises Elizondo, Herrera's neighbor. Herrera observed that the van's hood was open and there was a jack under the tire; however, smoke was not coming from the engine, nor did the van appear to have a flat tire. That night, Herrera learned that Elizondo reported "he had been robbed." Herrera stated he observed the same van in his neighborhood the following day on September 29, 2023, but this time near the corner of Victoria Street. Herrera testified that it appeared the van was having the same problems as the day before. He took photographs of the van and

3

the individual in the driver's seat, which were admitted as evidence. Herrera identified Pena as the driver of the van in the photographs.

Herrera testified that the van proceeded to leave the neighborhood and he followed it in his white vehicle. He testified that during this pursuit, he observed a Pharr Police Department (PPD) unit and waved his hand out of his vehicle in an attempt to direct the officer's attention to the van. He also noticed that the van had a flat tire. Herrera was subsequently pulled over by PPD and explained to the officer that he was following the van because his neighbor Elizondo reported a crime.

### 3.    Genaro Cortez

Genaro Cortez testified that he was employed by the Hidalgo County Irrigation District as an excavator operator and that he cleaned ditches. At approximately 10:00 a.m. on September 29, 2023, Cortez was "cleaning an irrigation canal" when he noticed a van and two young men running around the canal. He further testified that he was not concerned with the men at first because "a lot of people go running and walking there." However, Cortez eventually became concerned because the van was still running, whereas the people who go there to run and walk usually turn off their vehicles. Photographs of the van parked near the canal were admitted into evidence. Cortez described the area near the van's location as brush area. He also testified that Juan Balli Road was located behind the brush area.

### 4.    Miguel Martinez Aguirre

Aguirre testified he was seventy-seven years old, and he was driving to see his cardiologist in his light blue Honda on September 29, 2023. Aguirre testified that he was driving on Juan Balli Road and before he got to Jackson Road, "a male came out of the

4

brush area" and stood in front of his vehicle. Aguirre stated another man came up to the driver's side of his vehicle, asked for help, and then started hitting him. Aguirre tried to cover his face to prevent further injuries and was unable to see either of the men because he had blood in his eye. Photographic evidence admitted at trial depicted Aguirre's blood located on the ground at the scene where the attack occurred and around the driver's side of his vehicle. He also testified that one of the men unbuckled his seatbelt and the other man pulled him out of his vehicle. Once he was pulled out of his vehicle, a woman, identified as Blanca Rosales, arrived to assist Aguirre in moving him out of the road.

### 5. Blanca Rosales

Blanca testified that on September 29, 2023, she drove towards Juan Balli Road at approximately 9:45 a.m. Blanca explained that when she first drove by the area, she noticed a "white van on the other side of the canal." Blanca additionally saw a blue vehicle and "thought it had mechanic[al] problems," but when she passed the blue vehicle, she "saw a person being beat up." She also noticed two men on Juan Balli Road, with a third man in the driver's seat of the blue vehicle. Blanca further stated that she observed the driver of the blue vehicle being forcefully punched, strangled, and kicked by the other two men. To gather more information, Blanca followed the two men, who left the scene in the blue vehicle. After calling 911, she returned to the victim to assist with his injuries. After viewing previously admitted photographs of the van, Blanca confirmed that the van was the same one she observed earlier. She also identified the victim of the attack as the same man depicted in other photographs admitted into evidence.[2]

---

[2] During Blanca's testimony, Pena's counsel stipulated that the victim suffered bodily injury. *See* TEX. PENAL CODE § 29.03(a)(3).

5

**B.      Law Enforcement Testimony**

**1.      Officer Alexis Diaz**

PPD Officer Alexis Diaz testified that he was on patrol on September 29, 2023, when he noticed a white vehicle committing traffic violations at around 9:45 or 10:00 a.m. Officer Diaz "proceeded to conduct a traffic stop on said vehicle" in his "fully marked police unit with [his] emergency lights and sirens." Once he caught up to the white vehicle, Officer Diaz noticed it was following a van, which was operating with a flat tire. The white vehicle eventually stopped, and Officer Diaz conducted a traffic stop. He testified that the driver of the white vehicle, identified as Herrera, was cooperative, "calm, [and] just trying to provide information." Officer Diaz's dash camera video footage admitted into evidence depicted a white vehicle following a van. In the video, Herrera is seen waving his hand outside of his vehicle. Officer Diaz testified that an aggravated robbery occurred near the intersection of Juan Balli Road and Jackson Road approximately ten minutes after he stopped Herrera.

**2.      Detective Daniel Javier Rosales**

PPD Detective Daniel Javier Rosales testified that on September 29, 2023, he "responded to the scene where the van was at on a canal." After looking at photographs of the van near the canal that were admitted into evidence, he confirmed that was how he found the van when he arrived at the scene and that he spoke to an employee working on the excavator depicted in the photographs. Detective Rosales further stated that based on his training and experience, the van was parked in an unusual location. Detective Rosales looked inside of the van, as the windows were open, and discovered a receipt and a pipe. He additionally photographed a footprint in the brush area "running from the

6

van going east towards where [Aguirre]'s vehicle was at on Juan Balli Road." Detective Rosales also noted that the van was "missing a tire and rim on the driver's side rear."

### 3. Officer Alexis Rosas

PPD Officer Alexis Rosas testified that he was patrolling around 9:45 or 10:00 a.m. and was dispatched to "a possible robbery that had just occurred." When he arrived on scene, he observed "an old man in the middle of the street" who "looked like he had just received a beating." After contacting the victim, he noticed the man was bleeding from his eye and had blood all over his face and torso. Officer Rosas also made contact with Blanca who summarized her observations for him. He testified that he learned Aguirre's "injuries were made by two male subjects that were punching." On cross-examination, when counsel pointed out that Aguirre "testified that only one person was punching him," Officer Rosas repeated, "He had told me that he was being punched by both of them."

### 4. Detective Hector Castillo

PPD Detective Hector Castillo testified he "heard over the radio that there had been a robbery by Juan Balli and South Jackson" at approximately 10:00 a.m. He arrived at the scene shortly after and made contact with Aguirre. Detective Castillo additionally noticed a van by the canal with a missing tire. He received consent from Ortiz and conducted an inventory search of the van. Detective Castillo testified that he was able to get a name and description of the individual who drove the van. He further testified that he recovered a glass pipe and an Advance Auto Parts receipt dated earlier that same day. Detective Castillo stated that the receipt was significant because "it was time stamped for the morning just before the robbery" and it was important to determine who purchased an item on the day at issue. He also stated that the "van was involved in a

7

vehicle pursuit minutes . . . before the aggravated robbery." Detective Castillo identified Pena as the individual who was driving the van. He further testified that the aggravated robbery occurred approximately ten minutes after officers stopped Herrera.

Detective Castillo explained that he obtained video surveillance of Advance Auto Parts showing Pena arriving at the store, making a purchase, receiving a receipt, and returning to Ortiz's friend's vehicle, which was driven by Ortiz, on September 29, 2023. He testified that this purchase was consistent with Ortiz's statement, linked Pena to the items found in the van, and "confirmed that it was him inside that van." During his investigation, Detective Castillo was able to get information concerning Pena's whereabouts and located him at the home of Marissa Lima, Pena's common law wife, in Edinburg. He further testified that Aguirre's vehicle was located in Edinburg as well. Once Lima informed officers that Pena was in her home, Detective Castillo found him "hiding behind the door" in one of the rooms.

After taking him into custody, Detective Castillo and his colleague proceeded to conduct an interview of Pena in Spanish. The following exchange occurred during his testimony in the presence of the jury:

| [The State]: | Before speaking with [Pena], did you advise him of his constitutional right in connection with his privilege against self-incrimination? |
| --- | --- |
| [Detective Castillo]: | Yes, I did. Once I was in the interview room . . . I sat him down and I read him his Miranda warnings in Spanish. |
| [The State]: | Did you advise [Pena] of his right to an attorney? |
| [Detective Castillo]: | Yes, I did. |

. . . .

8

| | |
|---|---|
| [The State]: | Did you advise [Pena] at that time of his right to remain silent? |
| [Detective Castillo]: | Yes, I did. |
| [The State]: | Okay. And that anything he said could and w[ould] be used against him? |
| [Detective Castillo]: | Yes, I did. |
| [The State]: | Okay. And his right to have an attorney present prior to and during any questioning? |
| [Detective Castillo]: | Yes, sir. |
| [The State]: | Okay. And . . . his right to have an attorney appointed to advise him prior to and during any questioning, did you advise him of that? |
| [Detective Castillo]: | Yes, sir, I did. |
| [The State]: | And did you advise him of his right to terminate the interview at any time? |
| [Detective Castillo]: | Yes, I did. |
| . . . . | |
| [The State]: | Detective Castillo, are you fluent in the Spanish language? |
| [Detective Castillo]: | Yes, I am. |
| . . . . | |
| [The State]: | And you had every reason to believe that [Pena] was fluent in Spanish only? |
| [Detective Castillo]: | Yes. |
| . . . . | |
| [The State]: | And did you have any reason to believe that [Pena] was under [a] mental illness? |

9

[Detective Castillo]:      Negative, sir.

[The State]:      Did he appear to be under the influence of a mind-altering drug?

[Detective Castillo]:      No, sir.

[The State]:      Based on everything that you saw about [Pena], did it appear that he understood what you were saying to him?

[Detective Castillo]:      Yes, sir.

[The State]:      And did you understand what he was saying to you?

[Detective Castillo]:      Absolutely.

. . . .

[The State]:      [Detective] Castillo, when you . . . conduct a custodial interview of a defendant, where do you do that?

[Detective Castillo]:      We do it . . . upstairs in a [Criminal Investigations Division] office. It's a secure location with audio and video record[ing].

[The State]:      Do you sometimes use other devices that you take in there with you?

[Detective Castillo]:      Body[ ]cam[era].

. . . .

[The State]:      Okay. Does the recording reflect that the delivery of [Pena]'s rights . . . w[ere] done before asking any questions of him?

[Detective Castillo]:      Yes.

[The State]:      Okay. And does the recording reflect that [Pena] waived those rights and then agreed to talk to you?

[Detective Castillo]:          Yes.

After this exchange, the State moved to admit Pena's video-recorded statement. However, Pena objected, and the following colloquy ensued while the jury was present in the courtroom:

[Pena's counsel]:          Your Honor, we also question voluntariness and we [would] ask the [c]ourt to review at least the initial part of the videotape to see whether it complies with [Article] 38.22 before showing the video—or admitting the video into evidence.

. . . .

[W]e would argue under Section 6 as to [the] voluntariness of the statement, given the failure to comply with the full ["]knowingly, intelligently and voluntarily.["]

. . . .

(At the [b]ench, on the record)

[The State]:          I do understand under that section, Section 6 of [Article] 38.22, that the issue as to the voluntariness can be raised but [Pena] has not filed a motion to suppress or any other motion[.]

. . . .

[Pena's counsel]:          [I]f you read the statute, it says when the question of voluntariness is—of a statement of [an] accused, the [c]ourt must make an independent finding in the absence of the jury.

THE COURT:          Right. But it has to be requested. I can't—I do not represent [Pena]. It has to be a request made by the defense and a request for a hearing and a ruling. Has that been done?

[Pena's counsel]:          No. I wanted a ruling. If the [c]ourt's going to deny it, it's fine.

11

. . . .

(Open court, [Pena] present, no jury)

. . . .

THE COURT:                    [Pena]'s objections are overruled.

The trial court overruled Pena's objection outside of the jury's presence.

When the jury returned to the courtroom, the State proceeded to publish Pena's recorded statement and admitted into evidence a written translation of the statement. Pena's statement confirmed all of the details concerning his involvement in the robbery of Aguirre, including the trip to Advance Auto Parts, driving Ortiz's van, being in Herrera's neighborhood and being chased by him, encountering a police officer, getting a flat tire, and taking Aguirre's vehicle; however, Pena did not admit to hitting Aguirre. Detective Castillo testified that his investigation led him to another suspect by the name of Jesus Limas, Pena's brother-in-law. He obtained a statement from Limas and confirmed that Limas's statement was consistent with Pena's statement.

On re-cross examination, Pena's counsel asked Detective Castillo how he determined Pena was not using drugs, to which Detective Castillo responded, "Because [of] his composure. He was in five senses. He answered all [the] questions. He understood what I was trying to tell him. That's what makes me believe that he was capable of giving me his statement." Detective Castillo further testified that if he had noticed any signs or symptoms of Pena being intoxicated, he would not have interviewed Pena that day. After Detective Castillo testified, the State rested its case-in-chief and Pena did not call any witnesses.

12

## C.    Jury Charge, Verdict, and Sentence

On April 11, 2024, the trial court held a charge conference outside the presence of Pena and the jury. Pena's counsel had no objections to the proposed charge; however, he requested a change to the law of parties language and also requested the addition of a lesser included offense. The trial court denied both requests. The final charge included an instruction regarding the law of parties. Pena's counsel did not object to the proposed charge concerning Article 38.22 or the voluntariness of his statement to Detective Castillo. Following this conference, Pena rested his case-in-chief.

During its closing argument, the State summarized all of the testimony and evidence presented and briefly mentioned Pena's statement:

> And I want to talk about the defendant's statement. He wasn't—there was no signs of intoxication, no symptoms of mental illness. He was Mirandized just like you are supposed to do, and he freely and voluntarily waived his rights and he agreed to talk to Detective Castillo. And what did he say? He admitted to everything. He admitted to every single thing except, [he] didn't hit the old man, right. What a self-serving statement, and maybe that's true, right, or maybe it's not.

The jury found Pena guilty of aggravated robbery. Pena pleaded "true" to the indictment's felony enhancement paragraph, which the jury found "true." The jury sentenced Pena to fifteen years' imprisonment in the Texas Department of Criminal Justice Institutional Division. This appeal followed.

## II.    VOLUNTARINESS OF STATEMENT

Pena first argues that the trial court failed to conduct a hearing as to the voluntariness of his statement in accordance with Article 38.22 of the Texas Code of Criminal Procedure. Pena contends that he was harmed by this error because, among other things, he was deprived of a potential jury instruction under the same article.

13

**A. Standard of Review and Applicable Law**

Article 38.22, Section 6 provides that "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court *must* make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." *See* TEX. CODE CRIM. PROC. art. 38.22, § 6 (emphasis added); *Oursbourn v. State*, 259 S.W.3d 159, 175 (Tex. Crim. App. 2008) (explaining that when a question is raised regarding the voluntariness of a statement, the trial court should conduct a hearing outside of the jury's presence).

A trial court's failure to conduct a voluntariness hearing in accordance with Article 38.22 is subject to a harm analysis. *See Baiza v. State*, 487 S.W.3d 338, 346 (Tex. App.—Eastland 2016, pet ref'd). "[W]hen only a statutory violation is claimed, the error must be treated as non-constitutional for the purpose of conducting a harm analysis." *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005). Therefore, a violation of Article 38.22 is non-constitutional error subject to review under Texas Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b); *Funes v. State*, 630 S.W.3d 175, 183 n.7 (Tex. App.—El Paso 2020, no pet.) ("A violation of only Article 38.22 amounts to non-constitutional error." (citing *Woods v. State*, 152 S.W.3d 105, 118 (Tex. Crim. App. 2004))).

In conducting a harm analysis, we assume the defendant's statement was involuntary and thus improperly admitted, and we apply Rule 44.2(b) to determine whether the erroneous admission of the statement calls for reversal of the judgment. *See Kane v. State*, 173 S.W.3d 589, 594 (Tex. App.—Fort Worth 2005, no pet.). Under the applicable standard for non-constitutional error, we must disregard the trial court's error,

14

if any, "unless it affects the defendant's substantial rights." *King v. State*, 666 S.W.3d 581, 585 (Tex. Crim. App. 2023). A defendant's substantial rights are affected when the error has "a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023). "A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *King*, 666 S.W.3d at 585 (quoting *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

We review the entire record—"including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case"—to ascertain the effect or influence of the wrongfully admitted evidence on the verdict. *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011). We "may also consider the jury instruction given by the trial judge, the state's theory, defensive theories, closing arguments, voir dire, and whether the state emphasized the error." *Id.* The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis under Rule 44.2(b). *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008). "When the erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is harmless." *Eggert v. State*, 395 S.W.3d 240, 244 (Tex. App.—San Antonio 2012) (citing *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999)); *Cook*, 665 S.W.3d at 600 ("The erroneous admission of evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" (quoting *Leday v. State*,

15

983 S.W.2d 713, 718 (Tex. Crim. App. 1998))); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (error in the admission of evidence is harmless when the same evidence is offered without objection); *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (noting that similar evidence can render erroneously admitted evidence harmless); *Sandone v. State*, 394 S.W.3d 788, 794 (Tex. App.—Fort Worth 2013, no pet.) (applying the same principle to an alleged error in admitting evidence under Article 38.22).

## B. Harm Analysis

### 1. Cumulative Evidence

Assuming, without deciding, that the trial court erred by failing to conduct a voluntariness hearing concerning Pena's statement, we conclude that the record does not establish the requisite level of harm from that error.

Before the contents of Pena's statement were admitted and disclosed, the jury heard testimony from multiple witnesses concerning the events of September 29, 2023. Ortiz testified that she drove Pena to Advance Auto Parts to purchase lug nuts for her van that morning since Pena agreed to help fix her van. She further testified that Pena was the last person in possession of her van that day.

Herrera testified that he observed a van in his neighborhood, and after his neighbor reported a crime, he observed the same van again on September 29, 2023. Herrera further testified that Pena was the driver of the van, that the van had a flat tire, and that he followed Pena in his own vehicle. This chase was recorded on Officer Diaz's dash camera, which was admitted into evidence and published to the jury. Officer Diaz also confirmed the details of the chase and testified he observed the van was traveling on a flat tire. Further, he testified that an aggravated robbery occurred by Juan Balli and South

16

Jackson Road approximately ten minutes after he stopped Herrera.

Cortez confirmed that the van stopped in a brush area near the canal behind Juan Balli Road; however, the van was still running. Detective Rosales found the van near the canal and noted it was parked in an unusual location and missing a tire. Detective Rosales also testified that there was a receipt, a smoking pipe, and a footprint in the brush area "running from the van going east towards where the victim's vehicle was at on Juan Balli Road," where the aggravated robbery occurred.

Furthermore, Blanca testified that she saw a blue vehicle and "thought it had mechanic[al] problems," but when she passed the blue vehicle, she "saw a person being beat up." She also stated that the two assailants left the scene in the blue vehicle, and she tried to follow the vehicle and gather as much information as possible before calling 911 and returning to Aguirre to render aid. Aguirre confirmed that he was seventy-seven years old when this incident took place. He stated he was driving his vehicle when he was approached by two men and one of the men began hitting him.

Detective Castillo testified that he arrived at the scene, made contact with Aguirre, and noticed the van was missing a tire. He found a pipe and receipt dated earlier that same day in the van. Detective Castillo located Pena hiding behind a door in his common law wife's home. *See Simpson v. State*, 181 S.W.3d 743, 754 (Tex. App.—Tyler 2005, pet. ref'd) (evidence of hiding or fleeing from police evinces a consciousness of guilt). He stated that Aguirre's car was located in Edinburg as well. Detective Castillo also confirmed that Pena's brother-in-law, Jesus Limas, was another suspect in the aggravated robbery and that Limas's statement was consistent with Pena's statement.

After considering the entire record, we find that Pena's statement was largely

17

cumulative of all the properly admitted evidence considered by the jury as described above. *See Eggert*, 395 S.W.3d at 244. The jury was able to consider all such evidence and could have made reasonable inferences concerning Pena's involvement in the aggravated robbery, as a principal or a party. *See Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."). In addition, we cannot say that the prosecutor heavily relied on or emphasized Pena's statement in its opening or closing arguments. *See Barshaw*, 342 S.W.3d at 94; *Ramos v. State*, 273 S.W.3d 356, 360–61 (Tex. App.—San Antonio 2008, pet. ref'd). The prosecutor did not reference Pena's statement to police during his opening statement to the jury. Moreover, the prosecutor did not primarily focus on Pena's statement in its closing but instead summarized all of the other admitted evidence and only briefly referenced his statement. *See Ramos*, 273 S.W.3d 356 at 362 (finding error in admitting a confession harmless when "the prosecutor did not emphasize the confession as the linchpin to conviction but rather as evidence to suggest the jury should rely on the testimony of the witnesses"). In this regard, we do not find that Pena suffered harm when the jury heard his video-recorded statement.

### 2. Lack of Jury Instruction

Pena additionally claims that the trial court's failure to conduct a voluntariness hearing harmed him because he was deprived of a potential jury instruction under Article 38.22. Article 38.22 provides that a trial court may instruct a jury on the voluntariness of a defendant's statement. *See* TEX. CODE CRIM. PROC. art. 38.22, §§ 6, 7. Article 38.22, Section 6 provides that when a trial court independently finds in the absence of the jury

18

that a defendant's statement is voluntary, "evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof." *Id.* art. 38.22, § 6. In addition, Article 38.22, Section 7 provides that "[w]hen the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." *Id.* art. 38.22, § 7. But to trigger the trial court's duty to include a voluntariness instruction of a defendant's statement under either section, the record must contain some evidence that such a statement was involuntary. *See id.* art. 38.22, §§ 6, 7; *Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) (a defendant is required to present evidence to the jury from which a reasonable jury could conclude that his statement was involuntary).[3]

Pena claims that since the trial court failed to conduct a voluntariness hearing concerning his recorded statement, he was deprived of a potential jury instruction afforded to him under Article 38.22. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6, 7. The State responds that Pena did not introduce any evidence concerning voluntariness which contradicted Detective Castillo's testimony that Pena was not intoxicated at the time of the interview. We agree. Pena correctly points out that the trial court must submit the issue to the jury when evidence that a defendant's statement was given involuntarily is raised at trial. *See id.*; *Vasquez,* 225 S.W.3d at 545. However, other than his general voluntariness instruction argument, Pena does not explain which evidence, if any, exists

---

[3] Conversely, a trial court is required to hold a hearing under Article 38.22, Section 6, whenever "a question is raised" as to voluntariness, even if there is no evidence of involuntariness. TEX. CODE CRIM. PROC. art. 38.22, § 6.

from which the jury could have reasonably concluded that his recorded oral statement was involuntary, and we have found none. *See Vasquez*, 225 S.W.3d at 545. Rather, the recording of Pena's oral statement in Spanish, reviewed in conjunction with the admitted translation, shows that Detective Castillo informed Pena of his rights in accordance with Article 38.22 and *Miranda*; that Pena acknowledged that he understood his rights; and that, without any apparent coercion, Pena agreed to waive his rights and to discuss his alleged offense with Detective Castillo and his colleague. *See* TEX. CODE CRIM. PROC. art. 38.22, §§ 2(a), 3(a)(2); *Miranda v. Arizona*, 384 U.S. 436 (1966).

The record indicates that Pena's counsel suggested his statement was involuntary by questioning Detective Castillo regarding how he knew that Pena was not on drugs at the time he provided his statement. Detective Castillo answered the question and further testified that he would not have conducted an interview of Pena if he suspected Pena was under the influence of any substances. There is no evidence in the record before us indicating that Pena was intoxicated when he provided his statement.

Because there is no evidence indicating that Pena's recorded oral statement was involuntary, Pena was not entitled to a voluntariness instruction in the jury charge, regardless of whether the trial court held a voluntariness hearing outside the presence of the jury under Article 38.22, section 6. *See Oursbourn*, 259 S.W.3d at 175; *Vasquez*, 225 S.W.3d at 545–46 ("Under [A]rticle 38.22, there is no error in refusing to include a jury instruction where there is no evidence before the jury to raise the issue. Some evidence must have been presented to the jury that the defendant's confession was not given voluntarily.") (internal citations omitted). Thus, we cannot conclude that the trial court's failure to hold such a hearing caused Pena to suffer harm in this manner.

20

Based on the foregoing reasons, we have a fair assurance that any error in allowing the jury to consider Pena's recorded statement without an Article 38.22 instruction was harmless or had but a slight effect on the jury's verdict. *See King*, 666 S.W.3d at 585. We overrule Pena's first issue.

### III.     INEFFECTIVE ASSISTANCE OF COUNSEL

### A.     Standard of Review and Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Lynch v. State*, 318 S.W.3d 902, 904 (Tex. App.—San Antonio 2010, pet. ref'd) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "[A] person claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *Ex parte Covarrubias*, 665 S.W.3d 605, 609 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To satisfy the first prong, deficiency is established by "showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, considering the facts of the case viewed from counsel's perspective at the time of the representation." *Ex parte Garza*, 620 S.W.3d 801, 808–09 (Tex. Crim. App. 2021). The Texas Court of Criminal Appeals has routinely held that "claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus."

21

*Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). "On direct appeal, the record is usually inadequately developed and 'cannot adequately reflect the failings of trial counsel' for an appellate court 'to fairly evaluate the merits of such a serious allegation.'" *Id.* (quoting *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002)). In the absence of an explanation in the record for why counsel's conduct allegedly fell below this objective standard, we will "assume a strategic motivation if any can possibly be imagined" and not conclude that the challenged conduct constituted deficient performance unless the conduct was "so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see Ex parte Westerman*, 570 S.W.3d 731, 731 n.1 (Tex. Crim. App. 2019).

The appellant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Lynch*, 318 S.W.3d at 904; *Perez v. State*, 689 S.W.3d 369, 381 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.). We employ a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance and that it was motivated by a sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023). The presumption of a sound trial strategy generally cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007) ("The lack of a clear record usually will prevent the appellant from meeting the first part of the *Strickland* test."); *Davis v. State*, 533 S.W.3d 498, 510 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). If there is any basis for concluding that counsel's conduct was strategic, then further inquiry is improper. *Lopez*, 343 S.W.3d at 143. We consider "the reasonableness of counsel's actions at the time, rather than viewing such

22

actions through the benefit of hindsight." *Hart*, 667 S.W.3d at 782.

To establish prejudice under the second prong, the appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). Accordingly, failure to make a showing under either *Strickland* prong defeats a claim for ineffective assistance. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (citing *Thompson*, 9 S.W.3d at 813).

## B.     Analysis

Pena first argues that he was denied effective assistance because his trial counsel never requested to have an actual hearing outside the presence of the jury prior to his trial to determine the voluntariness of his statement under Article 38.22, Section 6. Contrary to Pena's contentions, his counsel did inform the trial court of the voluntariness issue when his counsel stated: "[I]f you read the statute, it says when the question of voluntariness is—of a statement of [an] accused, the [c]ourt must make an independent finding in the absence of the jury." Regardless, a specific request for a hearing was not necessary and raising the issue of voluntariness before the trial court admitted Pena's statement was sufficient to invoke the issue of voluntariness under Article 38.22, Section 6. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 175 (a "'question is raised' when the trial judge is notified by a party or raises on his own an issue about the voluntariness of the confession" and once raised, the trial court has a duty to conduct

23

a hearing outside of the jury's presence). We conclude Pena's trial counsel was not deficient in this regard. *See Ex parte Garza*, 620 S.W.3d at 808–09.

Pena also asserts that his trial counsel failed to "inform" the trial court about his motion to suppress. However, the failure of trial counsel to file or pursue a motion to suppress is not per se ineffective assistance of counsel. *See Loza v. State*, 659 S.W.3d 491 (Tex. App.—Eastland 2023, no pet.); *see also Ware v. State*, No. 07-07-0076-CR, 2008 WL 3863480, at *2 (Tex. App.—Amarillo Aug. 20, 2008, no pet.) (mem. op., not designated for publication) (recognizing the "failure to file or pursue pretrial motions generally does not *per se* demonstrate ineffective assistance of counsel"). To prevail on an ineffective assistance of counsel claim concerning a motion to suppress, Pena must show by a preponderance of the evidence that the motion would have been granted and that the remaining evidence would have been insufficient to support his conviction. *See Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Jackson v. State,* 973 S.W.2d 954, 956–57 (Tex. Crim. App. 1998). In his motion to suppress, Pena argued in part that he was "under coercive custodial interrogation" and that his statement was obtained in violation of Article 38.22. *See* Tex. Code Crim. Proc. art. 38.22. Pena does not direct us to any evidence concerning police coercion or that his statement was otherwise involuntary, nor have we located any such evidence. As indicated above, the record shows that Pena was informed of his rights in accordance with Article 38.22 and *Miranda*, acknowledged that he understood his rights, and agreed to speak with Detective Castillo. *See id.* art. 38.22, §§ 2(a), 3(a)(2); *Miranda*, 384 U.S. 436. Accordingly, Pena failed to establish that his motion to suppress would have been granted. *See Wert*, 383 S.W.3d at 753. Even if we assume that his statement should have

24

been suppressed, he fails to show that the remaining evidence properly admitted at trial would have been insufficient to support his conviction as we have found, supra. *See id.* Thus, Pena has failed to establish his counsel was ineffective for failing to inform the trial court about his motion to suppress.

Pena finally complains that his trial counsel failed to request a jury instruction concerning the voluntariness of his recorded statement. As previously discussed, because Pena did not present any evidence that his statement was involuntary, nor have we found any, the trial court did not err by failing to include such an instruction. *See Oursbourn*, 259 S.W.3d at 175; *Vasquez*, 225 S.W.3d at 545–46. Accordingly, Pena fails to show that his trial counsel's performance fell below an objective standard of reasonableness by failing to request a jury instruction that he was not afforded. *See Ex parte Covarrubias*, 665 S.W.3d at 609; *Ex parte Garza*, 620 S.W.3d at 808–09; *see also Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999) (en banc) (holding that appellant's counsel was not deficient under the first prong of the *Strickland* test for failing to request an instruction that appellant was not entitled to receive); *Cummings v. State*, 401 S.W.3d 127, 132 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) ("Appellant's trial counsel's failure to request an instruction to which appellant was not entitled is not ineffective assistance."). Therefore, we overrule Pena's second issue.

25

## IV.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
9th day of April, 2026.

26